# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *In re A.P.*, 2012 IL 113875

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* A.P. and J.P., Minors (The People of the State of Illinois, Appellant, v. Lisa P., Appellee). |
| | |
| Docket No. | 113875 |
| | |
| Filed | November 29, 2012 |
| | |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A finding of neglect based on injurious environment was reversed where entered against a mother who allowed her boyfriend to babysit in his home with no prior indication that he would not provide a safe environment and who, when she found her toddler injured there, immediately took the child to the hospital. |
| | |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Peoria County, the Hon. Mark Gilles, Judge, presiding. |
| | |
| Judgment | Affirmed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Jerry Brady, State's
Attorney, of Peoria (Michael A. Scodro, Solicitor General, and Sharon
Purcell, Assistant Attorney General, of Chicago, and Patrick Delfino,
Terry A. Mertel and Judith Z. Kelly, of the Office of the State's Attorneys
Appellate Prosecutor, of Ottawa, of counsel), for the People.


Louis P. Milot, of Peoria, for appellee.


Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier,
and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1       This appeal arises from a judgment of the circuit court of Peoria County that found A.P.
and J.P. to be neglected minors under section 2-3(1)(b) of the Juvenile Court Act of 1987
(Act) (705 ILCS 405/2-3(1)(b) (West 2010)) due to an environment injurious to their welfare.
At the subsequent dispositional hearing, the circuit court found that respondent-mother Lisa
P. was a fit parent and closed the minors' cases. Respondent appealed, challenging the
finding of neglect and the circuit court's admission of records from the Pediatric Resource
Center under section 2-18(4)(a) of the Act (705 ILCS 405/2-18(4)(a) (West 2010)). The
appellate court reversed, holding that the circuit court erred in admitting the records and
adjudicating the minors neglected. 2012 IL App (3d) 110191. Before this court, the State
challenges the appellate court's determination on both issues. For the reasons that follow, we
affirm the judgment of the appellate court reversing the trial court's determination that the
minors' were neglected.


¶ 2                                    BACKGROUND

¶ 3       Respondent is the mother of A.P., born on January 19, 2008, and J.P., born on September
24, 2003. A.P. and J.P. live with respondent, who is divorced from the minors' father,
Jeremy P. On August 17, 2010, respondent's boyfriend, Chad McLee, was at his home
looking after A.P. and J.P., and two of his own children, while respondent went to a doctor's
appointment. Respondent and the minors did not live with McLee. When respondent returned
following the appointment, she observed that A.P. had been burned on his face. She
immediately took him to the emergency room at OSF Saint Francis Medical Center (OSF)
in Peoria, where A.P. was treated for burns to his head.

¶ 4       On November 23, 2010, the State filed a juvenile petition alleging that A.P. was abused
because McLee inflicted physical injury upon him, by other than accidental means, in that
he burned his face with hot water, causing second-degree burns. The State also alleged that
A.P. was neglected in that his environment was injurious to his welfare because: (1) McLee

-2-

had burned A.P.'s face with hot water by other than accidental means; (2) the burns to A.P.'s face could not have occurred absent abuse or neglect on the part of McLee; and (3) McLee had lied to police about the incident but later told them that he had left the minors unsupervised with the bathwater running while he went outside. Based upon the incident involving A.P., the State filed a separate petition alleging that J.P. was neglected by reason of an environment injurious to his welfare. The petitions were consolidated for hearing. In respondent's answer to the petitions, she stipulated that the State would call witnesses that would support its allegation that McLee had lied to the police about A.P.'s scalding, and that he finally told them that he was running bathwater and left the children alone unsupervised while he went outside to smoke a cigarette.

¶ 5        Prior to the adjudicatory hearing, respondent filed a motion *in limine* seeking to exclude from evidence the introduction of letters or reports from the Pediatric Resource Center (PRC) containing any opinion, impression, or conclusion concerning the proximate cause of the injury to A.P. because the records did not meet the requirements for admission as a business record under section 2-18(4)(a) of the Act. She objected, in pertinent part, because the records were those of a consulting physician that were not made in the regular course of business but, rather, were prepared in anticipation of litigation, and contained opinions or conclusions as to the source of A.P.'s injury. She further objected to Dr. Petrak's letter and report because it failed to establish that her conclusions were within a reasonable degree of medical certainty. She also sought to exclude any documents prepared by the Department of Children and Family Services (DCFS) as part of its investigation into A.P.'s burns that were not certified under section 2-18(4)(a) of the Act. The trial court denied respondent's motion *in limine* and admitted the records into evidence.

¶ 6        The records indicated that A.P. was examined by Dr. Channing Petrak at the PRC clinic on August 19, 2010. Dr. Petrak subsequently issued a report on November 24, 2010, in which she opined that A.P.'s burns were "most consistent with inflicted burns due to child physical abuse." She based her opinion on the fact that A.P. had no burns on his hands or arms which would have been expected because children put their hands out to catch themselves when they fall. Based upon measurements of the bathtub and A.P.'s height, "it is not probable that [A.P.] would have been able to fall and catch himself in a way that only [the] left side of his face, ear and back of his neck were burned." Dr. Petrak also wrote that she reviewed notes from DCFS of its interviews with respondent, McLee, and the three other children who were in the house when A.P. was burned. Dr. Petrak wrote that the DCFS notes indicated that McLee's explanation as to what happened was not consistent. McLee variously claimed that he was looking in the mirror when A.P. came into the bathroom and slipped on something; he was in the den area having a cigarette with the door open rather than in the bathroom; and he was outside and did not see what happened.

¶ 7        At the adjudication hearing, the State entered into evidence, without objection, A.P.'s hospital records from OSF. The records indicated that A.P. had first- and second-degree scald burns on the left side of his head. The records also noted that respondent reported to the hospital staff that her boyfriend was watching A.P. He had already given a bath to two other children in the house when A.P. ran into the bathroom to get a toy, slipped on the floor, and fell head first into the bathtub. OSF contacted the Department of Children and Family

-3-

Services (DCFS) concerning A.P.'s burns and transferred him to the burn unit at Memorial Medical Center in Springfield. The hospital records indicated that A.P.'s grandmother stated that the minor had previous emergency room visits for falls and cuts to the face and that an unnamed boyfriend of respondent was involved in two of the episodes. The medical records indicated that A.P. had previously incurred a laceration to his lower lip after he fell off a chair and struck his lip against a wooden bedframe in July 2009. The records further indicated that he incurred a laceration to the left side of his forehead after he ran into a desk drawer at respondent's gym in January 2010. There was no indication from the medical records that McLee was involved in either of these incidents.

¶ 8 Respondent was the only witness to testify at the adjudication hearing. She testified that on August 17, 2010, she left A.P. and J.P. with McLee at his home while she went to a doctor's appointment. Respondent and McLee had separate living arrangements. McLee's 10-year-old son was visiting at the time from California and was present at the home. After her appointment, respondent called McLee when she was about 10 minutes away from his house to let him know that she was returning. They planned to leave for a barbecue when she got back and he told her that he was going to take a shower. When she arrived at the home, she observed blistering burns like a sunburn on half of A.P.'s face. She grabbed A.P. and immediately took him to the emergency room at OSF.

¶ 9 Respondent further testified that there had not been any incidents involving abuse of the children by McLee. She testified that A.P. had been taken to the hospital on two previous occasions. The first incident occurred when A.P. was approximately one year old when she was living at her mother's house and the minor slipped off the bed and split his lip open requiring stitches. The second incident occurred when A.P. was two years old and was being watched in the day-care center at respondent's gym. A.P. tripped and fell on a desk drawer and split his forehead open.

¶ 10 Following the adjudication hearing, the trial court concluded that while it could not find by a preponderance of the evidence that A.P.'s injuries were caused by abuse, the minors had been neglected by reason of an injurious environment. In reaching this determination, the trial court stated, in pertinent part:

"Dr. Petrak's language when she opined what was the cause of the child's injuries is basically this: It is most consistent with physical abuse. I don't know what she means by that. That's her best guess, is what I think she means by that, but I don't find in my review of the evidence submitted that I can say—and I thought this even before I heard argument and before I heard anything from any respondent in this case, I can't find that it is more likely than not that it was abuse.

*** I'm not making the more—what I would think [is] the stronger finding, is how I'll term it, of abuse, because there has been no competent evidence presented of any history of abuse.

If not for Mr. McLee's inability to just come clean with what happened, I may have been able to say it was an accident. But I don't believe that. I think it's—well, I don't believe that it is an accident that occurred without at least neglect. He was defensive, and he was trying to put himself in the best light with how things went on.

-4-

> I even sit here thinking maybe the final story he gave, maybe it was the story, might have been the truth, but I don't know that. I think more likely than not he was neglectful in watching your children that day, speaking to you, and he was trying to defend himself with regard to his neglectful actions.
>
> * * *
>
> *** [B]ased on the fact that Mr. McLee is obviously, if he's giving baths to these children, he's a big part of their environment. Their environment is injurious to their health. So this cause will need to be set for a disposition[al] hearing."

The trial court found that the minors' father, Jeremy P., did not contribute to the injurious environment. The trial court denied respondent's request to make a similar finding as to her because she had made the decision to leave the minors in McLee's care.

¶ 11 At the subsequent dispositional hearing, the trial court entered a dispositional order finding respondent and the minors' father to be fit parents and ordered the juvenile case closed. The trial court concluded that respondent could not have predicted that A.P. would be injured, and that she acted appropriately afterward. The trial court noted that all of respondent's actions after the incident occurred were "appropriate" and "somewhat commendable." Respondent appealed from the trial court's adjudication that A.P. and J.P. were neglected.[1]

¶ 12 The appellate court reversed after concluding that the trial court's finding that the minors were neglected was against the manifest weight of the evidence. 2012 IL App (3d) 110191, ¶ 23. The appellate court recognized this court's decision in *In re Arthur H.*, 212 Ill. 2d 441 (2004), and concluded that the trial court improperly adjudicated the minors neglected due to an environment injurious to their welfare because respondent had no previous reason to suspect McLee would act neglectfully in caring for them. *Id.* at ¶ 20. The appellate court concluded that the trial court's determination was effectively a *per se* finding of an injurious environment based upon the fact that A.P. was injured as a result of McLee's neglectful actions. *Id.* The appellate court concluded that it was clear that respondent's failure to provide a safe environment for A.P. was unintentional and not willful. *Id.*

¶ 13 The appellate court also found that the PRC records were improperly admitted by the trial court under section 2-18(4)(a) of the Act. *Id.* at ¶ 16. The appellate court noted that A.P. was examined by Dr. Petrak on August 19, 2010, but that the examination was not part of his follow-up medical care. *Id.* The appellate court noted that it was not until November 24, 2010, that Dr. Petrak issued her report in which she "opined that A.P.'s burns were 'most consistent with inflicted burns due to child physical abuse.' " *Id.* The appellate court concluded that the PRC records were not made in the regular course of business of a hospital

---

[1]The State acknowledged before the appellate court that even though the trial court did not adjudicate the minors wards of the court, and closed the case following the dispositional hearing, respondent still had the right to appeal the trial court's neglect finding. We note that respondent's appeal was not moot because in any hearing under the Act, proof of the abuse, neglect or dependency of one minor is admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible. See 705 ILCS 405/2-18(3) (West 2010).

or agency, but rather appear to have been prepared in anticipation of litigation. *Id.* Consequently, the trial court abused its discretion by admitting them into evidence. *Id.*

¶ 14    This court granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 15                                    ANALYSIS

¶ 16    The State contends that the appellate court erred in disturbing the trial court's determination that A.P. and J.P. were neglected minors based upon an injurious environment. The State argues that the appellate court improperly relied upon evidence that respondent did not know that her boyfriend would act neglectfully while watching her children and that she acted appropriately after discovering that A.P. was burned. According to the State, by focusing on the actions and knowledge of respondent, the appellate court, in conflict with the Act and this court's direction in *Arthur H.*, conflated the neglect inquiry with the question of whether respondent was a neglectful parent. The State argues that at the adjudicatory stage, in accordance with this court's prior direction, the trial court is not to assess blame and determine who is responsible for the neglect, but only whether the child is neglected.

¶ 17    The framework in which we consider the State's contention is a familiar one. "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463. "This analytical principle underscores the 'fact-driven nature of neglect and injurious environment rulings.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000)). It is the State's burden to prove allegations of neglect by a preponderance of the evidence. *In re N.B.*, 191 Ill. 2d at 343. In other words, the State must establish that the allegations of neglect are more probably true than not. *Id.* On review, a trial court's finding of neglect will not be reversed unless it is against the manifest weight of the evidence. *In re D.S.*, 217 Ill. 2d 306, 322 (2005). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.* If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the court must dismiss the petition. *In re N.B.*, 191 Ill. 2d at 343.

¶ 18    "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). In any proceeding initiated pursuant to the Act, including an adjudication of wardship, the paramount consideration is the best interests of the child. *In re N.B.*, 191 Ill. 2d at 343. The Act provides the procedures that must be followed for determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re A.W.*, 231 Ill. 2d 241, 254 (2008). A trial court must employ, pursuant to the Act, a two-step process to decide whether a minor should become a ward of the court. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1068 (2009).

¶ 19    Step one is the adjudicatory hearing on the petition for adjudication of wardship. *Id.* At the adjudicatory hearing, "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2010). "The legislature has stated that the purpose of an adjudicatory hearing is 'to determine whether the allegations of

a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence.' " *Arthur H.*, 212 Ill. 2d at 465 (quoting 705 ILCS 405/1-3(1) (West 2000)). "The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected." *Id.* at 465. "The legislature made no mention in this provision that during the adjudicatory stage of the proceedings the circuit court is also to determine who may be responsible for the child's neglect, and to assess the proportion of the blame with respect to such individuals." *Id.*

¶ 20    In *Arthur H.*, we concluded that the appellate majority's consideration of the relative blame of each parent for the child's neglect at the adjudicatory stage in the case was improper. *Id.* at 467. We explained:

> "Our holding that the Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are neglectful, furthers the purpose and policy of the Juvenile Court Act, which is to ensure the best interests and safety of the child. 705 ILCS 405/1-2 (West 2000). A contrary result would lead to the unacceptable proposition that a child who is neglected by only one parent would be without the protections of the Act. Similarly, a child would have no protection under the Act if the child were neglected, but it could not be determined which parent's conduct caused the neglect. ***
>
> ***
>
> *** [T]he only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful ***." *Id.*

¶ 21    Following the adjudicatory hearing, if a trial court determines that a minor is abused, neglected or dependent, the trial court then moves to step two, which is the dispositional hearing. 705 ILCS 405/2-21(2) (West 2010). At the dispositional hearing, the trial court determines whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a ward of the court. *Id.*

¶ 22    Pertinent to this appeal, a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2010). "Generally, 'neglect' is defined as the 'failure to exercise the care that circumstances justly demand.' " (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). This does not mean, however, that the term neglect is limited to a narrow definition. *Id.* at 463. As this court has long held, neglect encompasses "wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *Labrenz*, 411 Ill. at 624). "Similarly, the term 'injurious environment' has been recognized by our courts as an amorphous concept that cannot be defined with particularity." *Id.* Generally, however, "the term 'injurious environment' has been interpreted to include 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 23       With these principals in mind, we turn to the instant case. The State alleged in this case that both minors were neglected in that their environment was injurious to their welfare because respondent's boyfriend had burned A.P.'s face with hot water by other than accidental means; the burns to A.P.'s face could not have occurred absent abuse or neglect on the part of the boyfriend; and the boyfriend had lied to police, but later told them that he had left the minors unsupervised with the bathwater running while he went outside. The trial court ultimately held, in pertinent part, that the minors were neglected because "[McLee] was neglectful in watching [respondent's] children that day."

¶ 24       The State's reliance on *Arthur H.* for the proposition that under the Act the State can obtain a finding of neglect due to a babysitter leaving a child unattended, resulting in injury, even without a showing of any knowledge by the parents that the babysitter was an unsuitable caregiver is misplaced. The State's interpretation of the Act would, in essence, allow a finding of neglect due to an injurious environment *whenever* an injury to a minor could be attributed to improper supervision on the part of a selected caregiver, even in the case of the most conscientious parent who has exerted every reasonable effort in choosing a competent caregiver for his or her child. This would include an injury that could occur to a minor under the care of personnel such as a teacher, nanny, camp counselor, health-care worker, in a myriad of environments such as a day-care center, school, church, or hospital. The State's interpretation would also contradict our case law, including the requirement that where neglect is alleged, each case is to be decided on its particular facts; our prior emphasis on the fact-driven nature of neglect and injurious environment rulings; and the requirement that the State must prove neglect by a preponderance of the evidence. See, *e.g.*, *In re N.B.*, 191 Ill. 2d at 343, 346. We reject the State's claim that *Arthur H.* requires such an outcome.

¶ 25       In contrast to *Arthur H.*, there is no issue of apportioning culpability between the parents in this case because neither of them directly contributed to A.P.'s injury which was the basis of the trial court's neglect finding. It was not respondent or the minors' father who was found to have left the children unsupervised at the time A.P. was injured but, rather, McLee. As this court has long held, neglect is generally defined as the failure to exercise the care that the circumstances justly demand, while an injurious environment is interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463. Under the circumstances in this case, it would not be possible to focus on the status of A.P. and J.P., as *Arthur H.* instructs, and determine whether they had been neglected, without considering respondent's decision in choosing to have McLee babysit the minors. Simply put, in order to support the trial court's neglect findings in this case, there had to be some indication that respondent knew or should have known that McLee was an unsuitable caregiver. *In re M.Z.*, 294 Ill. App. 3d 581, 595-96 (1998) (for the State to obtain a finding of neglect due to a caregiver leaving a child alone, there had to be some indication that the parent knew or should have know that individual was an unsuitable caregiver).

¶ 26       Having determined what was necessary for the State to obtain a finding of neglect under the circumstances in this case, we turn to whether the trial court's neglect finding was against the manifest weight of the evidence. Here, the evidence established that respondent left the two children with McLee at his home while she went to a doctor's appointment. She and the

children did not live with McLee and she returned to his home immediately after her appointment. There was no indication that McLee could not provide a safe and nurturing shelter for respondent's children for the duration of the appointment. Similarly, there was no indication that the minors had previously been injured in McLee's presence, or that respondent had any reason to be concerned about him looking after the children. Respondent's testimony, as well as the hospital records from OSF, indicated that A.P.'s prior two injuries were accidents in which McLee had no involvement. After A.P. was injured in this case, respondent immediately brought him to the emergency room and there was no showing of further involvement by McLee with A.P. or J.P. For these reasons, we agree with the appellate court that the trial court's finding of neglect due to an injurious environment was against the manifest weight of the evidence in this case.

¶ 27    Finally, we need not consider whether the appellate court erred in concluding that the trial court abused its discretion by admitting into evidence, pursuant to section 2-18(4)(a) of the Act, the PRC records. These records included Dr. Petrak's report in which she detailed the results of the physical examination that she gave A.P., and contained her medical opinions and conclusions regarding the cause of the burns. The record before us establishes, as acknowledged by the State, that the trial court specifically rejected Dr. Petrak's conclusions contained in the PRC report and based its decision instead on evidence of McLee's conduct while he was charged with supervising the children. The neglect determination was based upon evidence in this case, which included respondent's testimony; A.P.'s hospital records from OSF, which were admitted without objection; as well as respondent's stipulation that McLee had lied to the police about A.P.'s scalding, and that he finally told them that he was running bathwater and left the children alone unsupervised while he went outside. Because the trial court's denial of respondent's motion *in limine* ultimately had no impact on the neglect findings in this case, we find no need to address whether the PRC report was properly admitted into evidence by the trial court.

¶ 28                                    CONCLUSION

¶ 29    For the foregoing reasons, we affirm the judgment of the appellate court, which reversed the trial court's finding that A.P. and J.P. were neglected due to an injurious environment.

¶ 30    Affirmed.