NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190672-U

NOS. 4-19-0672, 4-19-0673 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 15, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 19JA136 |
| v.    (No. 4-19-0672) | ) | |
| David M., | ) | |
| Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* V.M., a Minor | ) | |
| | ) | No. 19JA137 |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-19-0673) | ) | Honorable |
| David M., | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's August 2019 neglect finding was not against the manifest
weight of the evidence.

¶ 2    In May 2019, the State filed petitions for adjudication of wardship as to S.M.

(born in August 2008) and V.M. (born in May 2007), the minor children of respondent, David

M., asserting the minor children were both neglected and abused. After an August 2019

adjudicatory hearing, the Macon County circuit court found the minor children were neglected

and abused as alleged in the petition. After a September 2019 dispositional hearing, the court

(1) found respondent unfit and unable to care for the minor children, (2) made the minor children

wards of the court, and (3) placed the minor children's custody and guardianship with the Department of Children and Family Services (DCFS).

¶ 3        Respondent appeals, contending the circuit court erred by finding the minor children were neglected and abused.  We affirm.

¶ 4                                I. BACKGROUND

¶ 5        The minor children's mother is Jennifer H., who is not a party to this appeal.  The State's May 2019 petitions alleged the minor children were neglected pursuant to sections 2-3(1)(a) and 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), (1)(b) (West 2018)) and abused under section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West 2018)).  All three allegations asserted the minor children lived in a "blended family" home where the conditions were very poor with garbage and clutter all over the home.  Further, the school-aged children attended school with dirty and smelly clothes and very poor hygiene, which led the children to be ridiculed and humiliated by their school peers.  Additionally, the eldest child in the home had behavioral issues and had been abusing the younger children and animals.  "Neither the parent nor the stepparent ha[d] taken steps to correct the behaviors or obtain proper treatment for the child, despite court involvement several years ago, and ongoing, current intact services."

¶ 6        On August 15, 2019, the circuit court held the adjudicatory hearing.  The State presented the testimony of (1) Ashley Moffett, a DCFS investigator; (2) Tamela Brown, a DCFS child protection specialist; (3) Trisha Morehead, an intact case aide worker for the Youth Advocate Program; (4) Christine Foster, a parenting educator for the Youth Advocate Program; (5) Amanda Aubert, a housing advocate with the Youth Advocate Program; (6) Sara King, V.M.'s counselor with the Youth Advocate Program; and (7) Sandra Puhlman, an intact

supervisor for the Youth Advocate Program. The State also presented photographs of respondent's home that were taken on May 1, 2019. Respondent testified on his own behalf.

¶ 7    Moffet testified she received a report in early April 2019 about V.M. (1) having cut the hair of another child who was staying at respondent's home and (2) being mean to the other child. Concerns about supervision of the minor children were also raised. As part of her investigation, Moffet went to the minor children's school to talk to them. Both minor children had stained, dirty clothes and matted hair. V.M. also smelled. S.M. reported V.M. frequently hit her and was mean. When S.M. tells on V.M., no one makes V.M. stop. V.M. admitted she gets mad sometimes and does hit people. However, she denied cutting the other child's hair.

¶ 8    After school, Moffet met with respondent at his home. Respondent admitted he was not very good at disciplining the minor children. He did not know anything about hair cutting and had not observed any hitting recently. At that time, respondent's home looked fine.

¶ 9    Less than a month later, Moffet received a report about S.M. and V.M. smelling really bad, wearing dirty clothes, and having messy hair. This time when Moffet went to respondent's home, the home was in complete disarray with trash on the floor, dirty and moldy pans in the kitchen sink, an overflowing litter box, and clutter everywhere. Moffet went in the home's basement and saw trash and clothes everywhere. According to Moffet, the home was not a healthy environment for the minor children to be living in. Respondent explained he had a heart condition and could not do too much. Respondent also reported he lacked a washer and a dryer. He stated he was trying his hardest. Respondent's adult daughter, Amber M., and her child, Chloe M., were also living in the home. A man unknown to Moffet informed Moffet he was living in the home. The unknown man told Moffet the minor children were eating moldy food. Prior to her initial investigation, respondent was receiving intact services and had a youth

advocate.

¶ 10    When Moffet went to the minor children's school for the second time, the social worker reported the minor children were smelly and V.M.'s odor was so bad that other children would not stand next to her. The other children were making fun of V.M. V.M. was wearing the same clothes for three to five days straight. The school's principal also voiced concerns over the minor children's smell and clothes. The principal noted V.M. smelled like cat urine. Given the conditions of the minor children and the home, Moffet took protective custody of the children on May 1, 2019.

¶ 11    Brown testified she investigated the living conditions of the minor children and the discipline used in the home in January 2019. Brown exited the investigation in March 2019. The report was not indicated. At that time, respondent lived with the minor children, Amber, and his grandchild, Chloe. Amber's other child, Emma, visited every Wednesday and every other weekend. Respondent denied two other adults lived in the home. The Youth Advocate Program was already involved with respondent when Brown investigated. Brown also noted respondent had been receiving intact services since late fall 2018.

¶ 12    Morehead testified the Youth Advocate Program became involved with respondent and the minor children in October 2018 due to environmental issues. As the case aide, Morehead would meet with respondent once a week and try to set up goals for respondent. When she started, respondent was living in a trailer. The trailer was very dirty and cluttered. The back bathroom did not work, and one could fall through the floor in the laundry room. Clothes were everywhere in the minor children's room. In December 2018, the family moved into a home. They kept the home clean for a little bit, but the home became cluttered with dirty dishes on the counter. Morehead made chore charts for the minor children, having V.M. do the

dishes every day, S.M. take out the garbage, and the girls taking turns cleaning the cat litter boxes.  However, no one followed through with the chore charts.  Respondent did not establish any discipline in the home.  When she would visit the home, Morehead observed ashtrays had been dumped on the floor and other garbage was present on the floor as well.  Morehead would tell respondent he needed to pick the stuff up while she was there.  Morehead had to make him do it.  When Amber's mother died, respondent and Amber received the mother's washer and dryer.  The washer and dryer helped with the clothes until the washer broke.  Morehead noted Amber did a lot more of the cleaning and tried to make sure everything was somewhat picked up.  The house was cleaner when Amber was around.

¶ 13        Morehead also had to discuss V.M.'s hygiene with respondent on a weekly basis.  Morehead would tell respondent he needed to make sure V.M. was clean before she went to school.  Morehead included hygiene tasks on the minor children's chore chart.  However, respondent did not make the minor children do the chores on the chart.

¶ 14        Foster testified respondent was referred to her for parenting classes in January 2019 because respondent needed help with disciplining the minor children and learning how to clean his home.  The program consisted of 17 classes at the Youth Advocate Program office, and respondent did attend the classes.  Any class he missed, he made up with Foster.  However, respondent did not do his homework for the classes.  Respondent told Foster he had a heart condition and had trouble writing.  Foster suggested respondent could have Amber write out the answers for him.  For the last class, respondent did complete his homework, but it was clear Amber had answered the questions and not respondent.  According to Foster, respondent's participation in the parenting classes was minimal.  Foster did not pass respondent and recommended respondent take the parenting class again.  Foster had not yet received another

referral for respondent to retake the parenting class.

¶ 15 Aubert testified she received a referral for respondent in November 2018 because respondent was being evicted from his trailer. Aubert helped respondent get his current residence. She also gave respondent (1) a food pantry list, (2) a housekeeping checklist, (3) a clothing voucher, and (4) a furniture voucher. As part of her job, Aubert went to respondent's house regularly and talked about housekeeping and making budgets. She was in respondent's home at least three times a month. Some of her visits were planned, and some were unannounced. Aubert closed respondent's case on April 22, 2019, because respondent did not make any progress. Aubert felt respondent and Amber were not listening to what Aubert was saying about housekeeping and were not doing what needed to be done to maintain the home. Due to the lack of progress, Aubert took her supervisor with her on the April 11, 2019, visit. At that visit, Amber and Aubert's supervisor got into a disagreement over whose responsibility it was for the home's upkeep. Amber felt it was not her responsibility because she worked outside the home. At the last visit, Aubert had concerns about the home's cleanliness but did not find any actual hazards. As a result of respondent's and Amber's lack of motivation and attitude, Aubert's supervisor suggested Aubert close the case.

¶ 16 King testified she opened a case in December 2018 for V.M., who had been diagnosed with adjustment disorder with depressed mood and anxiety. King met with V.M. weekly and discussed V.M.'s hygiene and chores. V.M. reported she did her chores, but her hygiene was not very good. Regularly, V.M. would be very dirty, smell of urine, and have matted, greasy hair. King did worksheets with V.M., and V.M. could indicate she knew what to do to have good hygiene. However, V.M. was not doing them. V.M. was too preoccupied with other things to take care of her hygiene. According to King, V.M. was doing "very well" in her

current placement. V.M. is cleaner and seems much happier. Also, V.M. was no longer wetting the bed. As for V.M.'s behaviors, she had to adjust to the new rules and new home. Since V.M. has adjusted, "things have been going a whole lot better." To King's knowledge, V.M. was no longer hitting her sister.

¶ 17 According to Puhlman's testimony, the Youth Advocate Program received respondent's case in October 2018. The referral was based on environmental concerns. The family was living in a trailer at the time. Puhlman described the trailer as irreparable. It had too many hazards, including holes in the floor and clutter everywhere. Puhlman assigned every possible service she could to give support to respondent and his family. She did recognize providing multiple services can be a "slippery slope" with the family becoming dependent on the services provided by the agency. In this case, it became clear respondent was dependent on the services. Respondent did not follow through on the agency workers' directions. He also never provided medical documentation about his heart condition. In Puhlman's opinion, respondent was never able to keep the residence clean. She always had a concern about the cleanliness of respondent's home. Respondent's case was no longer open at the Youth Advocacy Program due to DCFS intervention.

¶ 18 Respondent testified he was currently homeless and either stayed with his father or a friend. Respondent believed the intact services he started receiving in October 2018 were due to V.M. He testified he would get V.M. up at 6 a.m. so she could take a couple of hours in the tub to get herself clean. He did not help her bathe or brush her teeth because she was an 11-year-old girl. Respondent also testified both minor children had chores. He would have to make V.M. rewash the dishes because she would leave stuff caked on them. According to respondent, he never had an issue with the minor children doing their chores.

¶ 19 Additionally, respondent testified he was on social security due to congestive heart failure. He had a pacemaker and saw Dr. Kola for his heart condition. According to respondent, he would have provided documentation about his heart condition if DCFS had asked for it. Respondent also testified he had a stroke in November 2018 and was hospitalized for three days. He was discharged to his home and told to take it easy.

¶ 20 After hearing the parties' arguments, the circuit court found the State had proved all the allegations in its petition by a preponderance of the evidence. The court noted it found the State's witnesses credible. The court concluded the minor children were abused and neglected.

¶ 21 On September 4, 2019, the circuit court held the dispositional hearing. The State recommended the minor children be made wards of the court and DCFS be granted guardianship based upon the dispositional report. Respondent accepted the State's recommendation, and the court also accepted the recommendation. On September 9, 2019, the court entered a written dispositional order (1) finding respondent unfit and unable to care for the minor children, (2) making the minor children wards of the court, and (3) placing the minor children's custody and guardianship with DCFS.

¶ 22 On September 26, 2019, respondent filed timely notices of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of respondent's appeals under Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016). See *In re Austin W.*, 214 Ill. 2d 31, 43-44, 823 N.E.2d 572, 580 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 31, 72 N.E.3d 260 (noting "dispositional orders are generally considered 'final' for the purposes of appeal"). This court

docketed S.M.'s case as case No. 4-19-0672 and V.M.'s case as case No. 4-19-0673. In October 2019, this court granted respondent's motion to consolidate the appeals.

¶ 23                                    II. ANALYSIS

¶ 24          The Juvenile Court Act provides a two-step process the circuit court must utilize to decide whether the minor children should become wards of the court. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336. Step one of the process is the adjudicatory hearing, at which the court considers only whether the minor children are abused, neglected, or dependent. See 705 ILCS 405/2-18(1) (West 2018); *A.P.*, 2012 IL 113875, ¶ 19. If the circuit court determines the minor children are abused, neglected, or dependent at the adjudicatory hearing, then the court holds a dispositional hearing, where the court determines whether it is consistent with the health, safety, and best interests of the minor children and the public for the minor children to be made wards of the court. *A.P.*, 2012 IL 113875, ¶ 21.

¶ 25          Here, respondent challenges only the first step. The State bears the burden of proving a neglect or abuse allegation by a preponderance of the evidence, which means it must show the allegations are more probably true than not. See *A.P.*, 2012 IL 113875, ¶ 17. The State only has to prove a single ground of abuse, neglect, or dependency to move the wardship proceedings to the second step. See *In re Faith B.*, 216 Ill. 2d 1, 14, 832 N.E.2d 152, 159 (2005) (noting the State need only prove one ground for neglect and thus this court may affirm if any of the circuit court's bases for a neglect finding are upheld). On review, this court will not reverse a circuit court's neglect or abuse finding unless it is against the manifest weight of the evidence. See *A.P.*, 2012 IL 113875, ¶ 17. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *A.P.*, 2012 IL 113875, ¶ 17.

¶ 26          In this case, the circuit court found the minor children were neglected under

section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)), which provides a neglected minor is "any minor under 18 years of age whose environment is injurious to his or her welfare." Our supreme court has explained the terms "neglect" and "injurious" as follows:

> "Generally, neglect is defined as the failure to exercise the care that circumstances justly demand. [Citation.] This does not mean, however, that the term neglect is limited to a narrow definition. [Citation.] As this court has long held, neglect encompasses wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes. [Citation.] Similarly, the term injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity. [Citation.] Generally, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. [Citation.]" (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 22.

¶ 27    Respondent asserts the State did not show the minor children's environment was injurious to their welfare. The State disagrees, noting the evidence at the hearing showed the residence respondent and the minor children were living in was very dirty and cluttered with garbage throughout the home. The State contends living in such a home created health risks for the minor children and fell short of ensuring a safe and nurturing shelter for the minor children. We agree with the State.

¶ 28    The evidence showed the Youth Advocacy Program employees helped respondent

move from a dilapidated trailer to a single-family home in good condition. Despite the assistance of the Youth Advocacy Program, the home became dirty and cluttered. Moffet, the DCFS investigator, went to the home on May 1, 2019, which was around five months after the family had moved into the home. Moffet testified the kitchen had dirty pans with mold growing in them and the litter box was overflowing. The home had trash on the floor, and it was "super cluttered." The basement of the home had clothes and trash everywhere. The State presented photographs of the home's condition during Moffet's May 2019 visit. Moffet testified respondent's home was not a hygienic or healthy environment for the minor children to be living in. Puhlman testified sometimes the home was less cluttered than others, but the home was never clean. Respondent told some of the Youth Advocacy Program workers he had a heart condition and could not do much around the home. However, the heart condition did not relieve him of his parental duty to provide a safe environment for the minor children. Moreover, the evidence showed others in the home could assist with keeping it clean. Thus, we conclude the circuit court's finding the minor children were neglected based on an injurious environment was not against the manifest weight of the evidence. Since the State need only prove a single ground of abuse, neglect, or dependency to move the wardship proceedings to the second step, we do not address respondent's arguments about the other two grounds. See *Faith B.*, 216 Ill. 2d at 14, 832 N.E.2d at 159.

¶ 29                               III. CONCLUSION

¶ 30        For the reasons stated, we affirm the Macon County circuit court's judgment.

¶ 31        Affirmed.