NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190649-U

NOS. 4-19-0649, 4-19-0650 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 6, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 19JA116 |
| v.    (No. 4-19-0649) | ) | |
| Davita W., | ) | |
| Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* E.A., a Minor | ) | |
| | ) | No. 19JA117 |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-19-0650) | ) | Honorable |
| Davita W., | ) | Karen S. Tharp, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's August 2019 neglect finding was not against the manifest
weight of the evidence.

¶ 2     In June 2019, the State filed petitions for adjudication of wardship as to L.M.
(born in January 2006) and E.A. (born in February 2014), the minor children of respondent,
Davita W., asserting the minor children were both neglected and dependent. After an August
2019 adjudicatory hearing, the Sangamon County circuit court found the minor children were
neglected. At the September 2019 dispositional hearing, the court (1) found respondent unfit,
unable, or unwilling to care for the minor children; (2) made the minor children wards of the

court; and (3) placed the minor children's custody and guardianship with the Department of Children and Family Services (DCFS).

¶ 3        Respondent appeals, contending the circuit court erred by finding the minor children were neglected.  We affirm.

¶ 4                                I. BACKGROUND

¶ 5        L.M.'s father is Lamar M., and E.A.'s father is Eddie A.  Neither father is a party to this appeal.  Count I of the State's June 2019 petitions alleged the minor children were neglected pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2018)), in that the minor children were not receiving the proper care and supervision necessary for their well-being because respondent failed to make a proper care plan for them.  Count II contended the minor children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)), in that the minor children's environment was injurious to their welfare as evidenced by respondent's mental health issues.  Count III asserted the minor children were dependent under section 2-4(1)(b) of the Juvenile Court Act (705 ILCS 405/2-4(1)(b) (West 2018)), in that the minor children were without proper care due to respondent's mental disability.

¶ 6        On August 15, 2019, the circuit court held the adjudicatory hearing.  The State presented the testimony of (1) Chance Warnisher, a Springfield police officer; and (2) Linda Hernandez, a DCFS child protection specialist.  The State also presented a copy of the written Facebook posts respondent made on June 13, 2019.  Respondent presented the testimony of (1) Quiana Head, respondent's cousin; (2) Mary Williams, respondent's mother; and (3) Sheena Cash, respondent's sister.

¶ 7        Officer Warnisher testified he was dispatched twice to respondent's residence on

the night of June 13, 2019, for a welfare check on respondent. He explained both dispatches were based on posts respondent made on Facebook. The Facebook posts were made close in time and stated the following:

"Lord i ask you to wrap your arms around us i ask you to not fault my children its not their fault at all mama just couldn't get it right i tried but just know before i leave yall here for mfs to treat yall bad and disrespectful im goin take yall with me sorry family but not sorry my kids or better of dead woth me than left here on this earth love yall but this here life aint treating us right…….lord forgive me……

When u thought u was strong enough for anything…..guess not i will be taking me and my kids away from this earth god forgive me for whts about to happen and yes family we have life insurance"

Officer Warnisher testified he never read the Facebook posts but was given a description of them.

¶ 8 Officer Warnisher testified that, when he went to respondent's residence the first time, he observed respondent sitting in a car, listening to music, playing on her phone, and drinking alcohol from a bottle. Officer Warnisher testified the conversation with respondent was pretty short and he was only at respondent's residence for about 10 minutes. When talking with respondent, she denied any of the accusations about her Facebook posts. Officer Warnisher told respondent she needed to quit drinking and go in for the night. Officer Warnisher testified respondent was under the influence of alcohol at that point and he advised her not to drive. Additionally, Officer Warnisher believed he went up to the residence and knocked on the door. He spoke with the minor children, who said they were fine. The minor children were playing

and did not appear to be in any harm. However, Officer Warnisher later testified he was not positive the minor children were in the home but did recall respondent saying the minor children were in the home.

¶ 9 Officer Warnisher further testified the second dispatch to respondent's home was about 1 to 1½ hours after the first dispatch. He had been told respondent mentioned burning the minor children or lighting them on fire in her Facebook posts. When he arrived, respondent was still sitting in her car, and the minor children were in the residence watching television and playing. Officer Warnisher observed a large can of lighter fluid sitting on the driver's side door rest. Officer Warnisher and another officer removed the lighter fluid from respondent and talked with her. Respondent again denied the accusations about the post. When further questioned, respondent admitted she was new to the area and her mother had "left her high and dry." According to Officer Warnisher, respondent appeared to be a lot more intoxicated than she was during his first visit. More alcohol was gone from respondent's bottle, and her speech was slurred. He estimated respondent was two or maybe even three times over the legal driving limit. Respondent took him and the officer to the backyard where she had a grill. She told the officers the lighter fluid was for making food. However, the grill was not lit, and the officers never observed any food. Officer Warnisher testified respondent became "very agitated" when she realized the police officers were not leaving.

¶ 10 Before the officers took respondent into her home, "family" arrived and entered the residence. Before entering respondent's home, Officer Warnisher and the other officer told respondent she was going to the hospital. When Officer Warnisher attempted to enter respondent's home with her, she tried to shut the door on him and stated he did not have the right to enter. At that time, "family" was upstairs with the minor children trying to get them packed.

The officers took respondent upstairs to her bedroom to get a few things, and she tried shutting the bedroom door on Officer Warnisher. The officers had to force their way into her bedroom and placed respondent in handcuffs. Officer Warnisher testified the minor children heard the struggle because respondent was yelling. The officers had the minor children get packed and leave the home. When respondent was searched, the officers did not find anything that could start a fire. Officer Warnisher and the other officer had to physically carry respondent out of the house and put her on a stretcher. Based on his training and experience, Officer Warnisher did not believe respondent was in the right state of mind to be taking care of the minor children.

¶ 11        Hernandez testified she was assigned to investigate allegations of abuse or neglect of the minor children on June 14, 2019. She received a report stating law enforcement had taken respondent in handcuffs to the emergency room due to respondent making suicidal and homicidal comments on social media. At the emergency room, respondent's blood alcohol content was "0.0191," and respondent was under the influence of cannabis. Hernandez was also informed respondent was the sole caregiver for the minor children when the Facebook posts were made and the police went to the home.

¶ 12        Moreover, Hernandez testified she had a telephone conversation with Head, who was very concerned about respondent and the minor children after seeing a post on social media. Head drove to Springfield from Collinsville, Illinois, to check on respondent and had someone else call law enforcement to do a "well check" on respondent. Head also stated respondent admitted to Head, the day after Head took the minor children from respondent's home, she intended to harm herself and the minor children. Hernandez testified she observed respondent's Facebook posts and respondent had posted two photographs of charcoal lighter fluid on Facebook along with the concerning comments. Based on the Facebook posts and respondent's

statement to Head, Hernandez took protective custody of the minor children the day after respondent went to the hospital.

¶ 13　　　　Hernandez also testified she spoke with respondent. Respondent admitted to making the Facebook posts but denied ever intending to harm her minor children. Respondent acknowledged going through a hard time but never gave a reason for her Facebook posts. Respondent also denied wanting to harm herself and told Hernandez the lighter fluid was for barbecuing.

¶ 14　　　　Additionally, Hernandez testified the minor children had previously been taken into care in December 2016 due to respondent's mental illness, alcohol abuse, and cannabis use. Respondent completed services, and the minor children were returned to her care. The case was closed in January 2019.

¶ 15　　　　Head testified Hernandez did contact her by telephone and the minor children were with Head at the time of the telephone call. Head stated she did not see respondent's Facebook posts but had received telephone calls from family members who had observed the posts. Head was unaware of whether respondent had a mental illness. Head denied telling Hernandez respondent admitted she was going to hurt herself and the minor children. Head had never observed respondent to be violent and did not think respondent would ever harm her minor children. Moreover, Head testified respondent did seem intoxicated when Head picked up the minor children during the incident. Head had seen respondent intoxicated before. Head also testified respondent was the sole caretaker of the minor children when she arrived at respondent's home.

¶ 16　　　　Williams testified she moved to Springfield from Belleville, Illinois, with respondent and the minor children in the middle of May 2019. Respondent thought she had a job

lined up when they moved here. Respondent was a good cook and thought she could find a good job in Springfield. On the morning of June 13, 2019, Williams left Springfield to return home. That day, respondent did not have a job and was frustrated about not being able to find one. Respondent was worried about how she was going to keep her home and provide for the minor children. Respondent was also sad Williams was leaving. However, respondent did not make any indications she intended to harm herself or the minor children. Williams also testified she had seen respondent have an issue with drinking. Williams testified respondent had been "44 days clean" at the time of the hearing. Respondent did not normally drink around the minor children. Williams had never seen respondent get violent when drinking or make threats about harming herself or the minor children. Williams described respondent as a good mother and was "just going through something." Additionally, Williams testified she had not read respondent's Facebook posts but heard about them. When Williams talked with respondent about the posts, respondent told her she did not remember making them.

¶ 17        Cash testified she was living near respondent during her first DCFS case and drove respondent to services. Cash only recalled driving respondent to parenting classes. While alcohol played a big part in why the minor children were taken away in the first case, respondent was not offered alcohol abuse services. Cash admitted respondent was also smoking cannabis at the time. To Cash's knowledge, respondent was no longer smoking cannabis. She also testified respondent had a history of mental health issues due to a very tough childhood. Cash testified she believed respondent started drinking a little more when she was unable to find a job in Springfield. Further, Cash testified she had seen respondent have an issue with alcohol. Cash had never seen respondent exhibit violence while respondent was drunk or sober. According to Cash, respondent did self-medicate with alcohol and had been visibly intoxicated around the

minor children. However, Cash did not believe respondent drank when she was alone with the minor children. Cash stated respondent was currently in alcohol treatment. Cash testified respondent would never willingly hurt her minor children because she loved the children more than herself.

¶ 18 After hearing the parties' arguments, the circuit court found the State had proved counts I and II of the State's petition by a preponderance of the evidence. The court declined to rule on the third allegation in the State's petitions.

¶ 19 On September 18, 2019, the circuit court held the dispositional hearing. The record on appeal does not contain a report of proceedings for the dispositional hearing. See Ill. S. Ct. R. 323 (eff. July 1, 2017). On the same day as the dispositional hearing, the court entered a written dispositional order (1) finding respondent unfit, unable, or unwilling to care for the minor children; (2) making the minor children wards of the court; and (3) placing the minor children's custody and guardianship with DCFS.

¶ 20 On September 19, 2019, respondent filed timely notices of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of respondent's appeals under Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016). See *In re Austin W.*, 214 Ill. 2d 31, 43-44, 823 N.E.2d 572, 580 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 31, 72 N.E.3d 260 (noting "dispositional orders are generally considered 'final' for the purposes of appeal"). This court docketed L.M.'s case as case No. 4-19-0649 and E.A.'s case as case No. 4-19-0650. In November 2019, this court granted respondent's motion to consolidate the appeals.

¶ 21                            II. ANALYSIS

¶ 22        The Juvenile Court Act provides a two-step process the circuit court must utilize

to decide whether the minor children should become wards of the court.  *In re A.P.*, 2012 IL

113875, ¶ 18, 981 N.E.2d 336.  Step one of the process is the adjudicatory hearing, at which the

court considers only whether the minor children are abused, neglected, or dependent.  See 705

ILCS 405/2-18(1) (West 2018); *A.P.*, 2012 IL 113875, ¶ 19.  If the circuit court determines the

minor children are abused, neglected, or dependent at the adjudicatory hearing, then the court

holds a dispositional hearing, where the court determines whether it is consistent with the health,

safety, and best interests of the minor children and the public for the minor children to be made

wards of the court.  *A.P.*, 2012 IL 113875, ¶ 21.

¶ 23        Here, respondent challenges only the first step.  The State bears the burden of

proving a neglect or abuse allegation by a preponderance of the evidence, which means it must

show the allegations are more probably true than not.  See *A.P.*, 2012 IL 113875, ¶ 17.  The State

only has to prove a single ground of abuse, neglect, or dependency to move the wardship

proceedings to the second step.  See *In re Faith B.*, 216 Ill. 2d 1, 14, 832 N.E.2d 152, 159 (2005)

(noting the State need only prove one ground for neglect and thus this court may affirm if any of

the circuit court's bases for a neglect finding are upheld).  On review, this court will not reverse a

circuit court's neglect or abuse finding unless it is against the manifest weight of the evidence.

See *A.P.*, 2012 IL 113875, ¶ 17.  "A finding is against the manifest weight of the evidence only if

the opposite conclusion is clearly evident."  *A.P.*, 2012 IL 113875, ¶ 17.

¶ 24        In this case, the circuit court found the minor children were neglected under

section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)), which

provides a neglected minor is "any minor under 18 years of age whose environment is injurious

to his or her welfare."  Our supreme court has explained the terms "neglect" and "injurious" as follows:

> "Generally, neglect is defined as the failure to exercise the care that circumstances justly demand.  [Citation.]  This does not mean, however, that the term neglect is limited to a narrow definition.  [Citation.]  As this court has long held, neglect encompasses wilful as well as unintentional disregard of duty.  It is not a term of fixed and measured meaning.  It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes.  [Citation.]  Similarly, the term injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity.  [Citation.]  Generally, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children.  [Citation.]"  (Internal quotation marks omitted.)  *A.P.*, 2012 IL 113875, ¶ 22.

¶ 25       Respondent asserts the circuit court's finding the minor children were neglected due to an injurious environment to their welfare as a result of respondent's mental health issues was not sufficiently supported by the record.  She asserts no evidence was presented of her having mental health issues.  The State disagrees, noting Cash's testimony about respondent's mental health issues and her attempts at self-medication by using alcohol and cannabis.  We agree with the State.

¶ 26       Respondent's own witness and sister, Cash, testified respondent had a history of mental health issues and had self-medicated with alcohol.  Cash also testified respondent had been visibly intoxicated in front of the minor children during her previous DCFS case.  Cash's

testimony is corroborated with Williams's testimony respondent had been known to have an issue with drinking. Williams also testified respondent was frustrated and very sad about not having a job, possibly not being able to keep her home, and Williams moving out. While Cash testified she did not believe respondent drank alcohol when she was the sole caregiver for the minor children, the evidence was undisputed respondent was intoxicated and the sole caregiver when the police did their two wellness checks.

¶ 27 Additionally, the language respondent used in her Facebook posts was disturbing. She more than once referred to the minor children dying with her. The photographs and actual presence of the lighter fluid added to the seriousness of her threats. Respondent's family members took the threats seriously as evidenced by Head's driving from Collinsville to check on respondent and the minor children and other family members calling the police.

¶ 28 The aforementioned facts are sufficient for the circuit court to have found respondent breached her duty to ensure a safe and nurturing shelter for the minor children. Accordingly, we conclude the circuit court's finding the minor children were neglected based on an injurious environment was not against the manifest weight of the evidence. Since the State need only prove a single ground of abuse, neglect, or dependency to move the wardship proceedings to the second step, we do not address respondent's arguments about the other two grounds. See *Faith B.*, 216 Ill. 2d at 14, 832 N.E.2d at 159.

¶ 29                                III. CONCLUSION

¶ 30 For the reasons stated, we affirm the Sangamon County circuit court's judgment.

¶ 31 Affirmed.