NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190707-U

NOS. 4-19-0707, 4-19-0708 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 13, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* D.D. & U.D., Minors, | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Macon County |
| v. | ) | Nos. 19JA213 & 19JA214 |
| Undra D., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's neglect finding and its subsequent dispositional order were not against the manifest weight of the evidence and the court did not abuse its discretion when it placed respondent's children in the custody and guardianship of the Illinois Department of Children and Family Services.

¶ 2    Respondent, Undra D., appeals the trial court's adjudicatory order finding two of respondent's children, U.D. (born August 17, 2017), and D.D. (born August 27, 2018), to be abused and neglected and the court's dispositional order making U.D. and D.D. wards of the court and placing them in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Respondent is the father of U.D. and D.D. The minors' mother, Iesha P., is not a

party to this appeal.

¶ 5        On July 15, 2019, the State filed a petition for adjudication of wardship alleging U.D. was neglected under section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2018)) (Count I) and section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)) (Count II) and was abused under section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West 2018)) (Count III). On July 16, 2019, the State filed an identical petition with respect to D.D. Specifically, Count I of both petitions alleged the minors were neglected because they were "not receiving the proper or necessary care recognized under State law as necessary for [their] well-being, in that, there [was] domestic violence between the mother and father in the presence of the children. The mother's parental rights [to] three other children have been terminated[.]" Count II of both petitions alleged the minors were neglected because their "environment [was] injurious to [their] welfare, in that, there [was] domestic violence between the mother and father in the presence of the children. The mother's parental rights [to] three other children have been terminated[.]" Finally, Count III of both petitions alleged the minors were abused because their "parent *** create[d] a substantial risk of physical injury to [them] by other than accidental means *** in that, there [was] domestic violence between the mother and father in the presence of the children. The mother's parental rights [to] three other children have been terminated[.]"

¶ 6        An adjudicatory hearing was held on September 6, 2019. At the hearing, the State first called Officer Tyler Nottingham of the Decatur Police Department. Officer Nottingham testified that on at least three occasions in 2019, he had been called to the apartment where Iesha P. and respondent were living. Officer Nottingham first was sent to the apartment in January 2019

in response to a call from Iesha P. He testified that after arriving at Iesha P.'s apartment, she informed him that respondent had "gotten physically violent with her," "strangled her to the point she couldn't breathe," broken a door, and stolen her phone. Officer Nottingham testified that he observed "furniture that had been dislodged, some things that had been turned over," "some marks around [Iesha P.'s] neck," and a broken door. Respondent was found a short time later in possession of Iesha P.'s phone.

¶ 7        Officer Nottingham also testified about a second incident involving respondent and Iesha P. This time, he responded to a call and found respondent, D.D., and U.D. at a bus stop. According to Officer Nottingham, respondent informed him that after an argument between respondent and Iesha P., respondent had taken the minors from Iesha P.'s apartment and Iesha P. then refused to allow him back into their apartment to get clothes for him and the minors. Officer Nottingham testified that he went to Iesha P.'s apartment, spoke with her, and she provided him with clothing. He also testified that, during his encounter with Iesha P., he did not observe any physical injury to her and there "was no allegation[ ] of any sort of physical contact."

¶ 8        Finally, Officer Nottingham testified that on July 12, 2019, he was called to Iesha P.'s apartment to assist DCFS in taking custody of D.D. and U.D. When Officer Nottingham arrived at the apartment, he attempted to talk to respondent who was being "somewhat argumentative" with him and with the DCFS caseworker who was present. According to Officer Nottingham, respondent "had one of the children in his arms" and "refus[ed] to give the child over." Officer Nottingham testified that respondent eventually allowed Iesha P. to take both children and give them to DCFS. During this incident, Officer Nottingham observed no "signs of physical injury" to respondent or to Iesha P.

¶ 9        The State next called KaTerra Bond, a DCFS investigator. According to Bond, DCFS received a report of "several domestic violence incidents between [respondent] and [Iesha P.]". Bond went to Iesha P.'s apartment to remove the children, which she eventually did with the assistance of Officer Nottingham. Bond testified that, before she removed the children from respondent and Iesha P., she was able to talk to Iesha P. but unable to talk to respondent because "he was very aggressive and angry." Iesha P. informed Bond that respondent "could get violent at times" and that respondent had physically abused her in January of 2019, causing her physical injuries. According to Bond, Iesha P. informed her that following that January incident, she was "coerced by [respondent] to change her story" so the criminal charges against him relating to that incident would be dropped. Iesha P. also informed Bond that police had been called to her apartment twice that week in response to "verbal altercations" between respondent and Iesha P. According to Bond, Iesha P. denied the verbal altercations had become physical but admitted that the children had been present during the altercations. Bond further testified that she did not observe any physical injuries to Iesha P. or to respondent on that date.

¶ 10        Finally, the State called Thalassa Peck, Iesha P.'s case manager, who testified that she interacted with Iesha P. regularly. According to Peck, Iesha P. had never told her that an argument between Iesha P. and respondent had become physical and Peck herself had never observed "any kind of physical damage or injury to [Iesha P.]." However, Peck acknowledged the couple's arguments were "[v]ery verbal, argumental [*sic*]."

¶ 11        The trial court took judicial notice of three prior Macon County cases in which Iesha P.'s parental rights with respect to three of her other children had been terminated.

¶ 12        Respondent presented no evidence.

¶ 13    On September 9, 2019, the trial court entered an adjudicatory order finding D.D. and U.D. were abused and neglected as alleged by the State in Counts I, II, and III. The court based its finding on "domestic violence, prior extensive DCFS involvement. Mother's parental rights to [three] other children terminated."

¶ 14    On October 11, 2019, the trial court conducted a dispositional hearing. The State called Erica Chevalier, the employee of Lutheran Child and Family Services (LCFS) who prepared a dispositional report. Chevalier testified that, despite her efforts, she had not had much interaction with respondent because he did not answer her phone calls. According to Chevalier, respondent had informed her that he had recently received a mental health and a substance abuse assessment, but when Chevalier telephoned the facility that supposedly performed the assessment, she was informed that was not accurate. Chevalier also testified respondent "stopped doing visits because he won't subject to random drug screenings," which she explained were required in order to participate in visits.

¶ 15    Upon the State's motion, the trial court admitted into evidence the dispositional report prepared by LCFS. No other witnesses testified at the dispositional hearing.

¶ 16    The trial court subsequently entered a dispositional order finding it to be consistent with the health, welfare, and safety of U.D. and D.D. and in their best interest to be made wards of the court. The court found Iesha P. unfit and unable to care for, protect, train, educate, supervise, or discipline the minors and that placement with her was contrary to their health, safety, and best interest because she "ha[d] several prior terminations of parental rights. Domestic violence issues continue[d] [and] she has not completed services to restore her to fitness." The court made a similar finding with respect to respondent explaining that its finding was based upon "domestic violence

[and] non[-]compliance with services." The court placed the minors in the custody and guardianship of DCFS.

¶ 17        This appeal followed.

¶ 18                        II. ANALYSIS

¶ 19        On appeal, respondent argues the trial court's finding that the minors were abused and neglected was against the manifest weight of the evidence and it was against the manifest weight of the evidence for the court to make the children wards of the court and place them in the custody and guardianship of DCFS.

¶ 20        Under the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)), the trial court employs a two-step process in determining whether a minor should be made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336. The first step is the adjudicatory hearing, at which the court considers whether the minors are abused, neglected, or dependent. *Id.* ¶ 19 (citing 705 ILCS 405/2-18(1) (West 2010)). During the adjudicatory hearing, the State bears the burden of proving its allegations of abuse, neglect, or dependency by a preponderance of the evidence, which means it must show the allegations are more probably true than not. See *id.* ¶ 17. On review, this court will not reverse the trial court's neglect finding unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 21        Here, the trial court determined the minors were neglected and abused based upon each of the three counts asserted by the State. However, the State need only prove a single ground of abuse, neglect, or dependency to move the wardship proceedings to the second step and we may affirm if any of the trial court's bases of neglect can be upheld. See *In re Faith B.*, 216 Ill. 2d 1,

14, 832 N.E.2d 152, 159 (2005).

¶ 22        The record amply supports the trial court's finding that the minors were neglected pursuant to section 405/2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b)(West 2018)) because of domestic violence between Iesha P. and respondent, as alleged in Count II. Section 405/2-3(1)(b) provides a neglected minor is one whose "environment is injurious to his or her welfare." Our supreme court has defined "neglect" and "injurious" as follows:

> "Generally, neglect is defined as the failure to exercise the care that circumstances justly demand. *** This does not mean, however, that the term neglect is limited to a narrow definition. *** [N]eglect encompasses wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes. *** Similarly, the term injurious environment has been recognized *** as an amorphous concept that cannot be defined with particularity. Generally, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 22.

"[T]he only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful." *In re Arthur H.*, 212 Ill. 2d 441, 467, 819 N.E.2d 734, 749 (2004).

¶ 23        Respondent contends the State failed to prove that the children were neglected due to domestic violence, as alleged in Count II, because the State presented evidence of only one

incident of physical violence between respondent and Iesha P. and no evidence was presented to show "the children were placed in any harm" during that incident in January. We disagree.

¶ 24 Here, in addition to the physical altercation between respondent and Iesha P. in January, the State presented evidence of multiple other altercations between them, two of which were proven to have occurred in the presence of the minors. At the adjudicatory hearing, the evidence showed respondent and Iesha P. had a contentious relationship. KaTerra Bond testified that according to Iesha P., respondent "could get violent at times" and that police had been called to Iesha P.'s apartment on two recent occasions prior to the date Bond removed the minors due to "verbal altercations" between respondent and Iesha P. Officer Nottingham testified regarding three incidents between respondent and Iesha P., including one that involved respondent strangling Iesha P. Although it is not known whether the children were present when respondent physically assaulted Iesha P., the incident demonstrates respondent's relationship with Iesha P. had been abusive for some time prior to the minors' removal in July. See *In re A.W., Jr.*, 231 Ill. 2d 241, 256, 897 N.E.2d 733, 742 (2008) ("[I]n cases in which parental anger is the basis for a finding of an injurious environment, evidence of parental anger and hostility in the presence, as well as outside the presence, of the children is admissible if it is relevant ***.")

¶ 25 Further, the minors were present during respondent and Iesha P.'s verbal altercations in the days preceding the minors' removal as well as during the resulting police responses. This evidence exhibits that, due to their contentious relationship, respondent and Iesha P. both subjected their children to a hostile home environment which, in turn, deprived the minors of a "safe and nurturing shelter." (Internal quotation marks omitted.) See *A.P.*, 2012 IL 113875, ¶ 22. Therefore, the trial court's finding that the children were proven neglected in Count II of the

State's petition for adjudication of wardship was not against the manifest weight of the evidence.

¶ 26        Following an adjudicatory hearing, if the trial court finds a minor to be abused, neglected, or dependent, the court then holds a dispositional hearing to determine whether it is consistent with the health, safety, and best interests of the minor children and the public for the minor children to be made wards of the court. *A.P.*, 2012 IL 113875, ¶ 21 (citing 705 ILCS 405/2-21(2) (West 2010)). If the minor "is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2018). "Prior to committing a minor to the custody of a third party, such as DCFS, a trial court must first determine whether the parent is unfit, unable, or unwilling to care for the child, *and* whether the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." (Emphasis in original). *In re M.M.*, 2016 IL 119932, ¶ 21, 72 N.E.3d 260 (citing 705 ILCS 405/2-27(1) (West 2012)). If the court makes such a determination, it may "commit the minor to [DCFS] for care and service." 705 ILCS 405/2-27(1)(d) (West 2018).

¶ 27        "[T]he term 'unfit' in the section [of the Juvenile Court Act] relating to removing custody and guardianship from a parent following a finding of neglect differs in meaning from the unfitness required to be found for termination of parental rights for purposes of appointing a guardian with consent to adopt." *In re T.B.*, 215 Ill. App. 3d 1059, 1061, 574 N.E.2d 893, 895 (1991). For dispositional purposes, the State must prove parental unfitness by a preponderance of the evidence. *In re A.P.*, 2013 IL App (3d) 120672, ¶ 15, 988 N.E.2d 221. On review, the trial court's dispositional decision "will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." *In re J.W.*, 386 Ill. App. 3d 847, 856, 898 N.E.2d 803, 811 (2008).

¶ 28    On appeal, respondent's only argument that the trial court's dispositional order was in error is that "[t]he purpose of the Juvenile Court Act is to promote and strengthen family ties" and the court's decision to place U.D. and D.D. with DCFS "definitely does not promote and strengthen family ties." We first note the Juvenile Court Act actually states its purpose is to "preserve and strengthen the minor's family ties *whenever possible*, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." (Emphasis added.) 705 ILCS 405/1-2(1) (West 2018). Here, the court found Iesha P. and respondent were unfit to care for U.D. and D.D. and it was in the minors' best interest that custody and guardianship be granted to DCFS. The court made specific findings with respect to both parents' fitness and ability to care for the minors. The court found Iesha P. unfit to care for U.D. and D.D. because her parental rights to multiple of her other children had previously been terminated, domestic violence issues persisted, and she had not completed services to restore her to fitness. The court found respondent unfit to care for U.D. and D.D. because of his history of domestic violence and his non-compliance with recommended services. The court's findings were supported by the evidence. The dispositional report documented that Iesha P.'s rights to her other children had been terminated, that both parents required additional services, and that there had been multiple instances of domestic violence in Iesha P.'s relationship with respondent, which, as noted above, resulted in the neglect finding.

¶ 29    The evidence presented in the dispositional report supports the trial court's determination that the best interests of U.D. and D.D. would be jeopardized if they remained in the custody of Iesha P. or respondent. Iesha P. had a history of involvement with DCFS and of refusal to participate in services necessary to reunite with her children. Respondent's actions

during the time between the adjudication and the dispositional hearing support a conclusion that his reunification with U.D. and D.D. was not in the minors' best interests. According to the dispositional report, respondent had been "confrontational" with Iesha P. during a joint visit with their children, had "voiced his anger in front of the children," and refused to acknowledge that his wrongdoing contributed to the removal of U.D. and D.D. Respondent's actions demonstrate that if the children were returned to him, they likely would continue to be exposed to the same environment that led to them being adjudicated neglected in the first place.

¶ 30    We find that the trial court's dispositional order was not an abuse of discretion.

¶ 31           III. CONCLUSION

¶ 32    For the reasons stated, we affirm the trial court's judgment.

¶ 33    Affirmed.