NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 200321-U

NO. 4-20-0321

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 10, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.P., K.Y., and K.H., Minors | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 20JA18 |
| v. | ) | |
| Sierra M., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | John R. Kennedy, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, concluding the trial court's dispositional findings
                were not against the manifest weight of the evidence.

¶ 2          In February 2020, the State filed a petition for adjudication of neglect, alleging

S.P. (born June 26, 2006), K.Y. (born July 27, 2010), and K.H. (born March 5, 2017) were

neglected in that their environment was injurious to their welfare when they resided with

respondent, Sierra M., because the environment exposed them to domestic violence.  In June

2020, respondent stipulated to the allegations in the petition, and the trial court entered an order

adjudicating the minors neglected.  In July 2020, the court entered a dispositional order making

the minors wards of the court and placing custody and guardianship with the Department of

Children and Family Services (DCFS).

¶ 3            Respondent appeals, asserting the trial court failed to comply with section 2-27(1)

of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-27(1) (West 2018)) and

the court's dispositional finding was against the manifest weight of the evidence.  Respondent

fathers, Xavier P. and William H., are not parties to this appeal.  For the following reasons, we

affirm.

¶ 4                                I. BACKGROUND

¶ 5                             A. Temporary Custody Order

¶ 6            In February 2020, the State filed a petition for adjudication of neglect, alleging

S.P., K.Y., and K.H. were neglected in that their environment was injurious to their welfare

when they resided with respondent because the environment exposed them to domestic violence.

The same day, the trial court entered a temporary custody order.  The temporary custody order

included the following relevant findings:

              "[Respondent] was arrested 1/15/20.  She was charged with

       offenses relating to a dispute between [respondent], another

       woman, and [respondent father].  According to police reports,

       [respondent] argued with the other woman.  [Respondent father]

       pushed [respondent] and broke her phone.  [Respondent], with her

       child in her car, drove her vehicle, striking the other woman's

       vehicle and striking a building.

              [Respondent] later changed her version of the incident with

       [respondent father].  Previously, she alleged she was battered by

       [respondent father].  In this later version, she fell and broke her

       phone herself.

[Respondent] advised of prior domestic violence with

[respondent father].  There are prior police reports of domestic

violence."

¶ 7                                B. Adjudication of Neglect

¶ 8           In June 2020, respondent stipulated to the allegations in the petition, and the trial

court entered an order adjudicating the minors neglected.  The adjudicatory order cited the

shelter care report as the factual basis for the stipulation.  The shelter care report indicated that,

on February 3, 2020, respondent stated she was going to try to get another order of protection

against William H.  As of February 6, 2020, respondent failed to obtain an order of protection.

The report stated, "The history of domestic violence has been perpetrated by [William H.] to

[respondent]; however, [respondent] has not been successful in limiting her interactions with

[William H.]," which ultimately led to the incident that caused DCFS involvement.

¶ 9                                C. Dispositional Hearing

¶ 10          Prior to the dispositional hearing, a dispositional report was filed.  The report

described the incident that led to DCFS involvement.  The report also described a prior domestic

violence incident as follows:

          "[William H.] and [respondent] were first police involved for

          domestic violence in June 2017 during an incident when [William

          H.] arrived to [respondent]'s home to obtain his belongings, at her

          request.  He was reportedly angry that she left the residence and

          left their child with a babysitter, and [William H.] punched

          [respondent] in the face, pulled her by the hair, grabbed her by the

          neck and threw her, took her phone, and refused to allow her to

- 3 -

leave, all while [respondent] held their three-month-old son.

[William H.] was indicated by the DCFS for risk of harm to

[K.H.]"

¶ 11       The report documented numerous other incidents of domestic violence between respondent and William H.  In July 2019, respondent obtained a plenary order of protection against William H., alleging she feared for her life and William H. had been stalking her.  Two months later, respondent requested dismissal of the order of protection.  According to the report, respondent had yet to engage in individual counseling due to the novel coronavirus pandemic.  However, respondent completed domestic-violence services through the Family Advocacy Center.  The pandemic prevented respondent from completing domestic violence services through Courage Connections, but she was aware she would receive additional domestic violence services when the services became available.  DCFS recommended further domestic violence services, including the development of a protection plan with concrete steps respondent could take to protect herself and her children.

¶ 12       In July 2020, the trial court held a dispositional hearing.  Respondent presented a supportive letter from Ladine Shelby, a licensed foster parent with 30 years' experience.  Shelby praised respondent's character and ability to care for her children.  Shelby expressed her hope that the court would give respondent the opportunity to have her children back in her care.

¶ 13       Sheniqua White, respondent's cousin, testified she had known respondent her entire life.  White had no concerns about respondent's ability to parent her children where she never saw respondent place her children in danger.  According to White, respondent was no longer in a relationship with William H., had no anger management problem, and was not a violent person.

¶ 14    Respondent testified William H. had been violent toward her but she was no longer in a relationship with him. In 2007, respondent was in a relationship involving domestic violence with a different person. According to respondent, she completed a six-week domestic violence course and had begun parenting classes. Respondent learned ways to avoid domestic violence and ways to protect herself and her children. Respondent testified she could avoid relationships involving domestic violence.

¶ 15    Respondent learned about the impact of domestic violence on her children, including that they might unintentionally be harmed. Respondent acknowledged exposure to domestic violence could make children think violence was acceptable. When asked if she acknowledged that domestic violence impacted her children, respondent stated, "No, because they wasn't around." Respondent acknowledged her youngest child was around for one incident of domestic violence but testified he was not aware of the violence because he was a baby.

¶ 16    Respondent consistently participated in visitation with her children until the pandemic prevented in-person visits. Respondent participated in telephone visits. According to respondent, she had an excellent, loving relationship with her children and provided them a safe home free of domestic violence since she was 15 years old. Respondent testified she was willing to participate in all recommended services and believed she could learn from the services.

¶ 17    When asked if there was anything else she would like the court to consider relating to the return of custody and guardianship, respondent stated,

> "I ask him to trust me and take a chance. Because my kids
> is everything to me. My oldest son lost his dad when he was three
> from gun violence. He got killed. And all he knows is me. All
> my babies know is me. I do everything that I'm supposed to do for

my kids, ever since I was 15 when I first had my daughter. I kept a house, a car, food, clothing, everything that I was supposed to do. I'm there in school. The education, my daughter gets straight A's. I'm not a bad parent. I have made some wrong chances—I mean, decisions in my life, but as far as being a parent, don't never say I'm not a good parent, because I love my kids, and I would never put my kids in harm's way, ever. They was never around. I do not do that with my kids. I love my kids, and my kids love me. They want to come home. Every time I go to my visits, my baby is crying to come home, and I have to say he can't come."

Respondent testified she could keep William H. away from her children and she could stay out of a relationship with him. Respondent lifted the July 2019 order of protection against William H. so William H. could be around his son, K.H.

¶ 18 The trial court found it was in the children's best interest to make S.P., K.Y., and K.H. wards of the court. The court found respondent unfit to care for, protect, train, or discipline any of the minors and it was not in the minors' best interest to be in her custody. The court removed the minors from respondent's custody and guardianship and placed custody and guardianship of K.Y. and K.H. with the guardianship administrator of DCFS. The court placed custody and guardianship of S.P. with respondent father, Xavier P., who the court found fit and willing to exercise custody and guardianship. Accordingly, the court found it was no longer in S.P.'s best interest to be a ward of the court and vacated the wardship of S.P. The court entered a written dispositional order, in part stating, "The [c]ourt adopts and incorporates herein its

findings rendered orally and in writing at all prior hearings including the temporary custody and adjudicatory hearings."

¶ 19    This appeal followed.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, respondent asserts the trial court failed to comply with section 2-27(1) of the Juvenile Court Act (705 ILCS 405/2-27(1) (West 2018)) and the court's dispositional finding was against the manifest weight of the evidence.

¶ 22    The Juvenile Court Act provides a two-step process for determining whether a child should be removed from parental custody and made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336. First, the trial court must conduct an adjudicatory hearing to determine whether the child is abused, neglected, or dependent. *Id.* ¶ 19. After a child is found neglected, the matter proceeds to a dispositional hearing. *Id.* ¶ 21. The trial court must determine, by a preponderance of the evidence, whether it is in keeping with the health, safety, and best interest of the minor to remain with the parent, or if alternative custody and guardianship placement, *i.e.*, with DCFS, is more appropriate. 705 ILCS 405/2-22 (West 2018). The court's central concern in fashioning a dispositional order is the best interest of the child. *In re M.P.*, 408 Ill. App. 3d 1070, 1073, 945 N.E.2d 1197, 1200 (2011). In making its decision, the court "should consider all reports, whether or not the author testifies, which would assist the court in determining the proper disposition for the minor." *In re L.M.*, 189 Ill. App. 3d 392, 400, 545 N.E.2d 319, 325 (1989). "A trial court's determination regarding dispositional unfitness will be reversed 'only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order.' "

- 7 -

*In re K.B.*, 2012 IL App (3d) 110655, ¶ 23, 973 N.E.2d 470 (quoting *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991)).

¶ 23        Respondent first argues the trial court failed to comply with the Juvenile Court Act, which requires a determination, supported by a written factual basis, that a parent is unfit, unable, or unwilling to care for, protect, train, or discipline the child and a determination that the health, safety, and best interest of the child will be jeopardized by remaining in the custody of the parent.  Respondent argues the court failed to articulate a factual basis for either determination.

¶ 24        The State argues respondent forfeited this argument by failing to raise this alleged error before the trial court.  The purpose of the forfeiture rule is to encourage parties to raise issues before the trial court, giving the trial court the opportunity to correct errors prior to appeal and ensuring a party does not obtain reversal through her own inaction.  *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14, 43 N.E.3d 1005.  However, forfeiture is a limitation on the parties and not this court.  *In re Madison H.*, 215 Ill. 2d 364, 371, 830 N.E.2d 498, 503 (2005).  Accordingly, we address the merits of respondent's claim.

¶ 25        Here, the trial court did not expressly lay out a factual basis for its dispositional determinations, either in writing or orally, following the dispositional hearing.  However, the court expressly adopted all findings, written and oral, from all prior hearings, including the temporary custody hearing and the adjudicatory hearing.  The court's previous findings referenced the various reports from DCFS documenting the January incident that led to DCFS involvement.  Those reports also documented a history of domestic violence between respondent and William H., including the order of protection respondent obtained against William H. less than six months before the incident that led to DCFS involvement.

¶ 26      "[T]he writing requirement contained in section 2-27(1) exists to give the parties notice of the reasons forming the basis for the removal of the child and to preserve this reasoning for appellate review." *Id.* at 374. Although the court did not expressly include its reasoning in writing or orally at the dispositional hearing, it did reference prior factual findings and reports that make clear its reasons for finding respondent unfit and the children to be jeopardized by remaining in her custody. See *In re Kenneth F.*, 332 Ill. App. 3d 674, 684-85, 773 N.E.2d 1259, 1267-68 (2002) (holding the trial court's oral ruling satisfied the writing requirement contained in section 2-28 of the Juvenile Court Act because it specifically relied on DCFS reports and these reports adequately contained the basis for the court's decision). This record gave respondent notice of the reasons for the removal of the children and adequately preserved the reasons for appellate review.

¶ 27      The record shows a history of domestic violence between respondent and William H. that endangered the children and required DCFS intervention. Not only does the record reveal multiple instances of domestic violence, but it also shows respondent obtained an order of protection she dismissed just months later with the express purpose of allowing William H. to see K.H. Moreover, one of the incidents involved William H. battering respondent while she held three-month-old K.H. in her arms. At the dispositional hearing, respondent testified she completed one domestic-violence course and learned strategies to avoid domestic violence. However, the dispositional report indicated DCFS recommended further domestic-violence services, which were unfortunately delayed by the pandemic. Moreover, even though respondent completed one domestic-violence course, she maintained domestic violence had not affected her children despite the incident where she held K.H. as William H. battered her. Under these circumstances, we conclude the requirements of the Juvenile Court Act have been met where

respondent had notice of the reasons for the dispositional determination and those reasons were adequately preserved for appellate review.

¶ 28 Respondent next argues the trial court's dispositional determination was against the manifest weight of the evidence. Specifically, respondent argues the court's decision was against the manifest weight of the evidence because she was no longer in a relationship with William H.

¶ 29 Our foregoing discussion of the history of domestic violence demonstrates the trial court's dispositional determination was not against the manifest weight of the evidence. Although respondent may no longer be in a relationship with William H., she has yet to fully acknowledge and appreciate the impact of domestic violence on her children, and DCFS has recommended further domestic violence services. Additionally, nothing in the record shows respondent has taken affirmative steps to keep her children safe from William H. Although she agreed to pursue another order of protection, DCFS was unable to find any record of respondent doing so.

¶ 30 We commend respondent on the services she has successfully completed thus far and regret the disruption in services and visitation the pandemic has caused. We trust DCFS will give respondent adequate time and resources to successfully complete the recommended services and continue to work toward the return of her children.

¶ 31                                III. CONCLUSION

¶ 32 For the foregoing reasons, we affirm the trial court's judgment.

¶ 33 Affirmed.