NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230039-U

NO. 4-23-0039

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 18, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* E.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | No. 21JA53 |
| | ) | |
| v. | ) | Honorable |
| Shane H., | ) | Curtis S. Lane, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The appellate court affirmed, granting appellate counsel's motion to withdraw and
finding the trial court did not err in returning the child to his father and closing the
neglect case.

¶ 2         In November 2021, the State filed a petition against respondent, Shane H.,
alleging her child, E.J., born in October 2020, was neglected because respondent experienced a
mental health crisis while E.J. was in her care and E.J. was present during a domestic violence
incident between respondent and E.J.'s father, Jacob J. Following an adjudicatory hearing, the
trial court found E.J. neglected because his environment was injurious to his welfare due to
respondent's actions. At the dispositional hearing, the court found Jacob was a fit, able, and
willing parent but respondent was unfit. The court returned E.J. to Jacob's care.

¶ 3          On January 3, 2023, the trial court entered an order closing the case. Respondent

appealed. This court appointed counsel to represent respondent. Counsel filed a motion to

withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing respondent's appeal

presents no potentially meritorious issues for review. We grant the motion and affirm the court's

judgment.

¶ 4                                    I. BACKGROUND

¶ 5          On November 29, 2021, the State filed a petition, alleging E.J. was neglected

under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-

3(1)(b) (West 2020)), in that his environment was injurious to his welfare. The State alleged, on

November 23, 2021, respondent and E.J. arrived at a local hospital by ambulance. Respondent

told medical staff she and E.J. were infested by parasites and said she had maggots and dead flies

in her mouth. Respondent also said she needed surgery to remove the maggots and, when she had

showered with flea and tick shampoo, maggots and flies fell off her body. A doctor at the

hospital took E.J into protective custody. The State also alleged another investigation of

respondent was pending due to respondent's mental health issues and respondent had recently

been released from a five-day stay at a mental hospital. The State further alleged respondent had

been granted an emergency order of protection against Jacob on November 10, 2021, due to a

domestic violence incident on November 3, 2021, during which E.J was present. The trial court

placed temporary guardianship of E.J. with the Illinois Department of Children and Family

Services (DCFS).

¶ 6          On April 12, 2022, the trial court held an adjudicatory hearing. Andy Bush, an

investigator with DCFS, testified a physician took protective custody of E.J. at Cottage Hospital

in Galesburg in the early morning hours of November 24, 2021. Bush had a conversation with

respondent about the incident that was difficult to follow. Respondent informed him she and E.J. had parasites on their bodies. She said she was diagnosed with scabies and was supposed to have her teeth cleaned but they would not clean her teeth because her mouth was full of maggots and she needed a $30,000 surgery to have the maggots removed. She also told Bush she had showered with flea and tick shampoo and, when she was done, the bathtub was full of maggots, dead flies, and feces. However, Bush learned from medical staff that nothing was medically wrong with respondent or E.J. Bush testified another DCFS investigation related to respondent's mental health had occurred a week or two before November 24. Respondent was hospitalized during that investigation.

¶ 7        The adjudicatory hearing was continued to May 17, 2022. On that date, Sheriff's Deputy Sam Holman testified he was dispatched to a domestic battery call on November 3, 2021. When he arrived, respondent, Jacob, E.J., and Jacob's father, Timothy, were present. Respondent claimed Jacob had become angry, threw her on the ground, and hit her after she asked Jacob to let E.J. spend the night at her house. She said Timothy then came upstairs and shoved her. E.J. was present at the time, and respondent had a swollen and bleeding lip. Holman spoke with Jacob, who said respondent had demanded E.J. spend the night. Jacob said respondent shoved him and got on top of E.J. to impede Jacob from taking E.J. Jacob was arrested for domestic battery.

¶ 8        Jacob testified he lived with respondent from February 2020 to October 2021. From June 2021 to November 2021, respondent thought she had scabies. Respondent went to "several ERs and Prompt Care." The ER doctors did not believe respondent. One doctor at "Prompt Care" gave her "ivermectin and permethrin" and others gave her just permethrin "in the event that it would help." On more than one occasion, doctors recommended respondent have a

"psych eval." Jacob reported he saw respondent "ripping at the skin on her face with a lice comb" when they lived together. He also saw her "pulling white chunks out of her gums" that she insisted were maggots, but which did not look like maggots to Jacob. Respondent told Jacob she would drink alcohol and it would hurt a great deal, but then the maggots would be less active. Jacob testified, between June and October 2021, respondent drank alcohol daily and took Adderall in excess of her prescription. She became erratic, could not complete sentences, and started tasks without finishing them. Her allegations regarding maggots increased during these periods. E.J. was present with her during those times.

¶ 9    Respondent testified she was no longer romantically involved with Jacob. She said she previously had head lice and possibly suffered an adverse reaction to a product she used for that. She denied saying she had parasites and said she went to doctors to ask what was wrong. She testified she had been diagnosed with scabies by a couple of doctors. She also testified she did not know what was wrong with her mouth, stating, "There was something, like, coming through, and it might have been calcium deposits. I didn't get the idea that it was maggots in my own head." She said she saw a dentist at the Knox County Health Department who diagnosed her with oral myiasis, "which is maggots in my mouth, and it's really, really scary, and she had referred me to an oral surgeon." However, respondent could not afford the oral surgery. Respondent admitted she was taking "antipsychotics," had taken more Adderall than prescribed "a few times," and that she was drinking alcohol four to five days per week. She also admitted she had previously been voluntarily admitted to a mental hospital in August 2021, stating she "just couldn't handle dealing with it, and I was, like, awful being crazy and it being, you know, a psychosis of mine." She also conceded she was admitted to a "psych ward" in August and November 2021.

¶ 10        The trial court found the unrebutted evidence showed a domestic violence incident occurred in November 2021 when E.J. was present. Additionally, the court found respondent was drinking four or five times a week and taking too much Adderall while caring for E.J. Finally, the court found respondent had mental health concerns. The court noted, even if respondent had been treated for scabies at one time, she received mental health treatment for a reason. Thus, the court found sufficient evidence E.J. was neglected.

¶ 11        The dispositional hearing was scheduled for June 9, 2022, but was continued to August 9, 2022, because respondent was receiving inpatient treatment. The hearing was later continued to December 20, 2022. At the hearing, multiple documents were admitted into evidence without objection. An integrated assessment noted respondent had been hospitalized for psychiatric care five times and attempted outpatient therapy once in 2021. She was diagnosed with attention deficit/hyperactivity disorder, borderline personality disorder, and bipolar disorder with psychotic features. Respondent had recently been prescribed lithium, Seroquel, and Trazodone. She admitted abusing Adderall.

¶ 12        A dispositional hearing report prepared by the agency assigned to the case by DCFS stated respondent's mental health impacted her ability to maintain stable housing throughout the case. Respondent struggled to stay on topic during conversations and openly struggled with her mental health during visits with E.J. She had also canceled visitation with E.J. At the time of the dispositional hearing report, Jacob had been having unsupervised visits with E.J. for three hours three days per week. Jacob's home had passed a safety check, and he had verified employment.

¶ 13        An addendum to the dispositional hearing report noted respondent had been "kicked out" of substance abuse treatment for not attending. Her contact with the agency since

her discharge from treatment was inconsistent, causing a delay in scheduling visits with E.J. Respondent tested negative for substances in early July 2022, and she reported she began working at McDonald's around that time.

¶ 14    An October 2022 status alert reported Jacob had completed a parenting class and a substance use assessment with no further recommendations. Jacob also had unsupervised visits with E.J. at Jacob's home four days per week for four hours at a time. E.J. was bonded to Jacob and had his own room and crib at Jacob's home. A December 2022 status alert reported Jacob had completed all but one of his recommended services and had started the remaining service of domestic violence treatment. Jacob had been having unsupervised overnight visits with E.J. with no concerns, and the agency recommended E.J. be returned home to Jacob. The State and the guardian *ad litem* also supported returning E.J. to Jacob.

¶ 15    When asked her position, respondent's attorney stated, "[A]s long as there's going to be orders in the family case that my client gets some contact with the child, I do have an exhibit that needs to be entered on her behalf to show compliance and a significantly better place that she is in now than she has been." That exhibit consisted of a letter from a representative of The Community House Network stating that respondent was an important member of their recovery community. Respondent did not present any other evidence.

¶ 16    The trial court found respondent unfit and found Jacob fit, able, and willing to care for E.J. The court declined to make E.J. a ward of the court, terminated the guardianship, and ordered E.J. to return home to Jacob. On January 3, 2023, the court entered an order closing the proceedings.

¶ 17    Respondent appealed, and this court appointed counsel to represent respondent.

¶ 18                    II. ANALYSIS

¶ 19        Appellate counsel moves to withdraw. In her motion, counsel states she read the record and found no issues of arguable merit. Counsel further states she attempted to advise respondent of her opinion, but respondent did not reply. Counsel also mailed a copy of the motion to withdraw to respondent's last known address. Counsel supports her motion with a memorandum of law providing a statement of facts, a discussion of potential issues, and arguments why those issues lack arguable merit. This court advised respondent she had until April 4, 2023, to respond to the motion, and respondent did not do so.

¶ 20        Counsel submits it would be frivolous to argue the trial court erred in finding respondent unfit and finding Jacob fit, such that E.J. could be returned to Jacob. We agree.

¶ 21        The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) governs petitions for adjudication of wardship and outlines a "two-step process a trial court must employ in deciding whether a minor should be made a ward of the court." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1068, 918 N.E.2d 284, 288 (2009). Step one requires the trial court to hold an adjudicatory hearing, where the court shall first consider only the question of whether the minor is abused, neglected, or dependent. *Jay. H.*, 395 Ill. App. 3d at 1068; 705 ILCS 405/2-18(1) (West 2020). If the court answers the first question in the affirmative, *i.e.*, the minor is an abused, neglected, or dependent child, the court must move to step two—the dispositional hearing. *In re A.P.*, 2012 IL 113875, ¶ 21, 981 N.E.2d 336; 705 ILCS 405/2-21(2) (West 2020).

¶ 22        Neglect cases are "*sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d 441, 463, 819 N.E.2d 734, 747 (2004); see also *A.P.*, 2012 IL 113875, ¶ 24 ("[W]here neglect is alleged, each case is to be decided on its particular facts ***."). Our supreme court has repeatedly emphasized the "fact-driven nature of neglect and injurious environment rulings." (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 17

(quoting *Arthur H.*, 212 Ill. 2d at 463). While the term "injurious environment" is an "amorphous concept that cannot be defined with particularity," the term "has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 22 (quoting *Arthur H.*, 212 Ill. 2d at 463).

¶ 23 After the trial court determines a minor is neglected, the court moves to the second step, which is the dispositional hearing. 705 ILCS 405/2-21(2) (West 2020). At this hearing, the court determines what further actions are in the best interests of the minor. *In re April C.*, 326 Ill. App. 3d 225, 237, 760 N.E.2d 85, 95 (2001). The court's ruling must "determine the proper disposition best serving the health, safety[,] and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2020).

¶ 24 On review, we will reverse a trial court's order if the findings are against the manifest weight of the evidence. *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991). "The finding of the trial court is against the manifest weight of the evidence if a review of the record clearly demonstrates that the proper result is the one opposite that reached by the trial court." *In re M.K.*, 271 Ill. App. 3d 820, 826, 649 N.E.2d 74, 79 (1995).

¶ 25 Here, as counsel notes, the State proved E.J. was neglected. As the trial court found, the unrebutted evidence showed E.J. was present during a domestic violence incident. Respondent also admitted to abusing alcohol and her prescription medication while caring for E.J. While respondent denied some of the mental health allegations, she admitted others. Regarding the matters she denied, the fact that she suffered some sort of psychiatric incident resulting in irrational thoughts was well supported by the evidence. Respondent was then hospitalized, during which time she could not care for E.J. Accordingly, we agree with counsel

that the court's determinations of neglect and respondent's unfitness were not against the manifest weight of the evidence.

¶ 26     As to Jacob's fitness and the decision to close the proceedings and return E.J. to him, all involved agreed with E.J.'s return home to Jacob. No one objected. The properly admitted reports and assessments showed Jacob had finished nearly all his recommended services and already had regular overnight visitation with E.J. Meanwhile, respondent was still having significant difficulties. Given the lack of objection and significant evidence supporting the return of E.J. to Jacob, the trial court's decision to terminate the guardianship and return E.J. to Jacob was not against the manifest weight of the evidence.

¶ 27                                III. CONCLUSION

¶ 28     After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel that this appeal presents no issue of arguable merit. Accordingly, for the reasons stated, we grant the motion to withdraw as appellate counsel and affirm the trial court's judgment.

¶ 29     Affirmed.