NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240732-U

NO. 4-24-0732

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 9, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 23JA130 |
| v. | ) | |
| Erica H., | ) | Honorable |
| Respondent-Appellant). | ) | Timothy J. Cusack, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) the trial court's adjudicatory order finding the minor neglected was not against the manifest weight of the evidence, (2) the adjudicatory order was not the product of an improper application of the theory of anticipatory neglect, and (3) the court did not improperly combine the adjudicatory and dispositional hearings without a clear demarcation.

¶ 2    On July 18, 2023, the State filed a petition for adjudication of neglect, alleging G.L. (born on July 10, 2023) was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)). On January 9, 2024, the State filed an amended petition, alleging neglect on the same statutory basis and identifying G.L.'s putative father as Jay L., who was incarcerated at the time. (Jay L. is not a party to this appeal.) On April 25, 2024, the trial court entered an adjudicatory order finding G.L. neglected. Following a dispositional hearing the same day, the court entered an order finding respondent, Erica H., unfit to care for G.L.

¶ 3        Respondent appeals, arguing (1) the trial court's adjudicatory order was against the manifest weight of the evidence, (2) the adjudicatory order was the product of an improper application of the theory of anticipatory neglect, and (3) the court improperly combined the adjudicatory and dispositional hearings without a clear demarcation. For the reasons that follow, we affirm.

¶ 4                                I. BACKGROUND

¶ 5        On July 18, 2023, the State filed a petition for adjudication of wardship, alleging G.L., respondent's tenth child, was neglected due to being in an environment injurious to her welfare in that respondent (1) was found unfit in nine prior juvenile cases, (2) had not completed services to be restored to fitness, and (3) told an Illinois Department of Children and Family Services (DCFS) investigator five days before the petition was filed she did not know who G.L.'s father was (but thought he was either Mike L. or Jay L.) See 705 ILCS 405/2-3(1)(b) (West 2022). The trial court entered an order placing G.L. in the temporary custody of DCFS. On January 9, 2024, the State filed an amended petition. In addition to the aforementioned allegations, the State alleged respondent "ha[d] not successfully completed and/or applied services" offered for her potential restoration to fitness. In the amended petition, G.L.'s putative father was identified as Jay L., who was incarcerated in Indiana at the time. On March 7, 2024, respondent filed her answer to the amended petition, (1) stipulating "to the content of the record" in her nine prior cases, (2) demanding strict proof of the allegation she had not completed services to be restored to fitness, and (3) admitting the allegation she was not aware of who G.L.'s father was (with the qualification "Mike" may have been "Nick").

¶ 6                                    A. Adjudicatory Hearing

¶ 7          The trial court conducted the adjudicatory hearing on April 25, 2024. The court began by taking judicial notice of the nine prior juvenile cases and admitting into evidence the results of a drug drop from September 1, 2023, in which respondent tested positive for amphetamine and methamphetamine.

¶ 8                                    1. *The State's Evidence*

¶ 9                                    a. LaDonna Boken-Buckley

¶ 10          LaDonna Boken-Buckley was the FamilyCore caseworker for G.L.'s case, as well as the cases in Peoria County involving two of respondent's other children. Respondent concealed her pregnancy with G.L. and denied being in a relationship with Jay L. Boken-Buckley determined Jay L. was the father after finding him in the Tazewell County jail. The agency did not know about respondent's pregnancy until being informed by DCFS. Respondent did not give birth to G.L. in a hospital, but rather gave birth either on the side of the road, in a parking lot, or in an ambulance. (Boken-Buckley could not remember the location.) Boken-Buckley attempted to visit respondent at her home, but nobody would ever answer the door, despite signs of people being inside. Overall, Boken-Buckley described respondent as uncooperative and dishonest.

¶ 11          Boken-Buckley explained respondent has a son in Tennessee who was presently involved with that state's child welfare system. Respondent previously placed this child with his father, a sex offender, in Indiana, and she subsequently relocated him to a "known drug home" in Tennessee, where she burned him with a cigarette. Respondent told the child welfare personnel in Tennessee she was completing the services required in her various Illinois cases, but this was not true.

¶ 12        Respondent reported undergoing counseling "outside the agency" but "didn't want to disclose where she was getting her counseling." Consequently, Boken-Buckley was unable to speak with respondent's counselor. Boken-Buckley went to respondent's home to have her sign consents for the release of her counseling records. However, respondent would not let Boken-Buckley inside and ended the visit when asked if Jay L. was inside. Respondent did not complete an anger management class, despite requesting this herself. Respondent did not complete the domestic violence perpetrators class recommended due to her "unhealthy relationships." Due to the positive drug test in September 2023, respondent was required to complete a new substance abuse assessment, but she did not do so, as she denied using methamphetamine. (Respondent also tested positive for tetrahydrocannabinol (THC) and had both "a few diluted drops" and multiple missed drops.)

¶ 13        Respondent had a history of significant mental health issues, namely, anxiety, depression, and avoidant personality disorder. Previously, respondent was prescribed seven or eight different medications to assist her. Against medical advice, respondent stopped taking the medications in 2010 because she did not like how the medications made her feel. Boken-Buckley described an occasion after a court hearing around December 2023 when respondent said her car and phone were being tracked and complained about bugs being underneath her skin. During this time, respondent was testing positive for methamphetamine use. Respondent was told to undergo a new mental health assessment, but she failed do so.

¶ 14        Another incident in which Boken-Buckley observed respondent's mental health was declining involved a conversation in December 2023, when respondent "got very irate, upset, [and] raised her voice to where, outside the courtroom to where the guard had to come over because of how she was expressing herself out there." Boken-Buckley believed respondent

was angry with her and the agency. During this encounter, respondent screamed at Boken-Buckley, was red-faced, increasingly loud, and had difficulty breathing while "talking really fast." Respondent complained of "14 years of DCFS involvement and getting no where [*sic*]" and that "Illinois does not want her to have her children." Boken-Buckley believed respondent "doesn't apply the services that she has done in the past."

¶ 15    Boken-Buckley described respondent's similarly concerning behavior at a visit with G.L. in December 2023. Respondent "was not herself" and was dizzy and slurring her speech to the point the case aide was concerned she would drop G.L. Respondent lost her balance at one point. Respondent attributed her behavior to "a severe migraine." Boken-Buckley believed respondent's behavior was drug-related, as she was sitting in the chair, arching her back and complaining of her back, not her head, and asking for water. They ended up calling an ambulance to have respondent evaluated.

¶ 16    Boken-Buckley testified about concerning behavior that started arising again in 2022. These behaviors included hallucinations, mental illness requiring consistent counseling, poor judgment due to mental health, placement of a child with a sex offender, the hiding of her pregnancy, marijuana consumption while pregnant, numerous psychiatric hospitalizations, and substance abuse problems. Previously, respondent was indicated for death by neglect for a prior child, which provided one basis for the commencement of this case.

¶ 17                              b. Thecla Gavin

¶ 18    Thecla Gavin is a licensed counselor at FamilyCore who taught the domestic violence class to which respondent had been referred. The day before the class was to begin, respondent called Gavin, "stating that she did not feel like she needed a domestic violence victims class" because she had "already taken the class three times." Gavin continued:

"[Respondent] stated that she felt that it was stupid, she felt that the agency was stupid, and her caseworker was stupid. She said that if she had to come to class, then she would call others in the class stupid b***. She was upset about having to take the class."

Gavin informed respondent she was only allowed one absence from the class. Respondent stated she would not be there the first day, and she did not attend. Respondent did not attend the next session and was dismissed from the class.

¶ 19                                    2. *Respondent's Evidence*

¶ 20          Respondent testified she completed a parenting class in 2021 but has "taken it again just like a refresher course." When asked to explain what she learned from this class, respondent stated, "More like the patience part with everything and being a little bit more nurturing because I kind of distant [*sic*] myself with [*sic*] my kids a little bit when they are first born because normally they would be put in the system."

¶ 21          Respondent stated she did not ask for anger management counseling specifically, but she did seek out counseling on her own in November 2023. When asked why, respondent explained:

"Because of the not knowing how to handle my anger emotions with the agency and trying to make sure I can communicate at a better level to where I can actually understand and get clarification because for the last year and a half I have not known what they want me to do. I've completed the services, and I get no answers about what they want from me. This has been going on for almost 15 years. I don't know what the courts want from me. I made it clear back in August *** I need direction. You have to be

specific with me, and I've not gotten that. I use an example that I have made a commitment with Burger King not with Steak & Shake. The previous caseworker, I utilized her as saying the "Cheeseburger King." LaDonna Steak & Shake. I don't know what LaDonna wants from me, you know. I'm in a position where I don't know what you want. I know what I was supposed to do previously, so that's what I'm doing. I'm not getting any direction as to where I actually need to go."

¶ 22　When asked to explain testing positive for amphetamine and methamphetamine in September 2023, respondent stated, "Honestly, at that time I was burning a lot of stuff. I had some lung problems, taking a bunch of different medications. I do a lot of junking. I was not using gloves and handling things." Respondent claimed she was applying the skills she had learned in her services and disagreed with any contrary suggestion. During cross-examination, after the trial court admonished her and the State not to interrupt or argue with one another, respondent suddenly stated:

"I would like to honestly just sign off on [G.L.] and go get my son because Tennessee wants to give me my son.

＊＊＊

I mean, that's honestly where I'm at right now because I don't get no direction from them and I feel like this Court does not want me to have my babies."

¶ 23　Respondent explained she did not attend Gavin's domestic violence class because "they have those classes like every three or four months, so if I don't go this month, it's not like

they wouldn't have another class. That was my mentality." When asked why she told Gavin she would show up to the class and call the participants "stupid b***," respondent answered:

> "I didn't say I would call them stupid b***. I didn't want to feel like I wanted to call them that. I used the word I feel that I don't want to call them that, but I know my mentality. Like, I do not want to sit in places with feeling uncomfortable and not knowing why I'm being here and situations. Like, I've been to enough of those classes, and I feel bad for a lot of those women. I really do. I know how it is to be there. I was in a 13-year relationship that it took a long time to get out of when I stayed there."

¶ 24                    3. *The Trial Court's Adjudicatory Ruling*

¶ 25        The trial court adjudicated G.L. a neglected minor. The court began by observing respondent stipulated to some of the allegations in the neglect petition and "[t]hat alone would be enough to adjudicate." The court continued, "Secondly, as to the other allegations as to whether [respondent has] completed or [is] complying with recommendations, I'm finding based upon the testimony that there are items she hasn't completed. There are certainly items that she hasn't been able to apply that she's previously taken."

¶ 26                    B. Dispositional Hearing

¶ 27        The trial court immediately proceeded to a dispositional hearing. After the hearing, the court entered a dispositional order, finding respondent unfit for reasons other than financial circumstances alone to care for G.L., making G.L. a ward of the court, and continuing her guardianship and custody with DCFS, with the right to place.

¶ 28        This appeal followed.

¶ 29                           II. ANALYSIS

¶ 30         On appeal, respondent argues (1) the trial court's adjudicatory order was against

the manifest weight of the evidence, (2) the order was the product of an improper application of

the theory of anticipatory neglect, and (3) the court improperly combined the adjudicatory and

dispositional hearings without a clear demarcation.

¶ 31         A. The Trial Court's Adjudicatory Order Was Neither Against the Manifest

                  Weight of the Evidence nor the Product of an Improper Application of the

                                 Theory of Anticipatory Neglect

¶ 32         The Juvenile Court Act provides a two-step process the trial court must follow in

deciding whether a minor should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18;

see 705 ILCS 405/2-18(1), 2-22(1) (West 2022). Step one is the adjudicatory hearing, where the

court considers only whether the child is abused, neglected, or dependent. See 705 ILCS 405/2-

18(1) (West 2022). One of the statutory bases for a finding of neglect is when the minor's

environment is injurious to their welfare. *Id.* § 2-3(1)(b). Importantly, the concept of an

" 'injurious environment' has been recognized by our courts as an amorphous concept that

cannot be defined with particularity." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). Nevertheless,

this concept "has been interpreted to include the breach of a parent's duty to ensure a safe and

nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.*

¶ 33         As the State alleged G.L. was neglected due, in substantial part, to respondent

being found unfit in cases involving G.L.'s siblings, the instant case involves the theory of

anticipatory neglect. As our supreme court has explained:

            "Under the anticipatory neglect theory, the State seeks to protect not only

            children who are the direct victims of neglect or abuse, but also those who

have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child. [Citation.] The theory of anticipatory neglect flows from the concept of an 'injurious environment' which is set forth in the Act. [Citation.]

*** Although section 2-18(3) of the Act [citation] provides that the proof of neglect of one minor 'shall be admissible evidence' on the issue of the neglect of any other minor for whom the parent is responsible [citation], *** the mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor. Each case concerning the adjudication of minors, including those cases pursued under a theory of anticipatory neglect based upon the neglect of a child's sibling, must be reviewed according to its own facts." *Id.* at 468-69.

¶ 34 The State bears the burden of proving a neglect allegation by a preponderance of the evidence. *A.P.*, 2012 IL 113875, ¶ 17. An appellate court will not reverse a trial court's finding unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 35 Although respondent had completed parenting classes more than once, she was not able to cogently explain, much less apply, what she learned through this service. Respondent reported engaging in counseling with an outside provider but, according to Boken-Buckley, she would not sign releases to allow communication between the agency and her counselor. Indeed, when Boken-Buckley went to respondent's home for this purpose, respondent, as part of a pattern of uncooperativeness and dishonesty with the agency (which included concealing both

her pregnancy with G.L. and her ongoing relationship with Jay L.), ended the visit and would not allow her inside. This is particularly significant given respondent's extensive history of mental health issues, including anxiety, depression, and avoidant personality disorder, and her troubling behavior. The evidence further revealed respondent (1) reported believing her car and telephone were being monitored and that she had bugs underneath her skin and (2) loudly and angrily confronted Boken-Buckley outside the courtroom to protest her extensive history with DCFS, feelings of getting nowhere, and feelings of Illinois not wanting her to have her children. Boken-Buckley told respondent she would have to undergo a new mental health assessment, but she did not do so.

¶ 36 Respondent also failed to address her issues with substance abuse. Respondent did not undergo a new substance abuse assessment, despite being required to do so after testing positive for amphetamine and methamphetamine in September 2023. (Respondent also tested positive for THC and had both diluted and missed drug drops.) In an incident Boken-Buckley attributed to drug use, respondent slurred her speech and became dizzy to the point of losing her balance, requiring an ambulance to be called. Respondent denied using amphetamine or methamphetamine, instead using the excuse the positive result could have arisen from "burning a lot of stuff" while "junking" and "not using gloves," or from taking unspecified medications.

¶ 37 Additionally, respondent was not engaged in domestic violence services required due to her history of unhealthy relationships. The day before the domestic violence class was to begin, respondent called Gavin and complained about having taken the class three times already, described the class, the agency, and her caseworker as "stupid," and expressed her intention to berate the other participants with epithets should she have to attend. Moreover, by her own

admission, respondent's "mentality" was to not be concerned about attending this class since it may be available three or four months later.

¶ 38 The evidence established respondent had 10 children and was found unfit in nine prior juvenile cases. Respondent had not sufficiently engaged in services, either in connection with the prior cases or the instant one, to be restored to fitness. This court concludes the trial court's adjudicatory order finding G.L. neglected was not against the manifest weight of the evidence, as the opposite conclusion is not clearly evident. *A.P.*, 2012 IL 113875, ¶ 17. Furthermore, as the court considered respondent's *current* lack of meaningful engagement in services, and thus did not give conclusive effect to the prior findings of her unfitness for its determination of whether G.L. was neglected, its adjudicatory order here was not the product of an improper application of the theory of anticipatory neglect.

¶ 39 B. The Trial Court Did Not Improperly Combine the Adjudicatory and Dispositional Hearings Without a Clear Demarcation

¶ 40 Following an adjudication of neglect, the trial court must conduct a dispositional hearing to determine if the minor should be made a ward of the court. 705 ILCS 405/2-22 (West 2022). In considering the appropriateness of wardship, the court must decide if the parent is unfit, unable, or unwilling, for reasons other than financial circumstances alone, to care for, protect, train, or discipline the minor, and if the health, safety, and best interest of the minor will be jeopardized if the minor remains in the parent's custody. *Id.* § 2-27(1).

¶ 41 Respondent contends the trial court ruled on the adjudicatory and dispositional phases of the proceeding simultaneously and without any demarcation. Accordingly, respondent requests this court remand the dispositional determination for separate consideration. "The [Juvenile Court] Act requires that the adjudicatory hearing be conducted separately from the

dispositional hearing." *In re Timothy T.*, 343 Ill. App. 3d 1260, 1265 (2003). This requirement can be satisfied even when the dispositional hearing is held immediately after the adjudicatory hearing, so long as "the record indicates a clear line of demarcation between the adjudicatory and dispositional hearings." *Id.* at 1266.

¶ 42 The record in the instant case reflects the necessary separation. At the beginning of the adjudicatory hearing, the court announced, "[T]he matter was set today for adjudication/disposition." Following its oral ruling on the adjudicatory portion, the court mistakenly said, "We'll move on to adjudication," but then immediately asked, "As to the dispositional report, did everyone receive a copy of that?" The court also asked Boken-Buckley if she had "any additions, corrections, or deletions to [her] dispositional report." At the conclusion of this hearing, the court found respondent unfit, "t[ook] wardship" over G.L., appointed DCFS as her guardian, and recited a series of services it was requiring of respondent (memorialized in a supplemental task order attached to the dispositional order.) As there was a clear line of demarcation between the adjudicatory and dispositional hearings, the court's dispositional determination need not be remanded for separate consideration.

¶ 43 III. CONCLUSION

¶ 44 For the reasons stated, we affirm the trial court's judgment.

¶ 45 Affirmed.