NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241529-U

NOS. 4-24-1529, 4-24-1530, 4-24-1531 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.A., Jax. A., and Jay. A., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | Nos. 24JA41 |
| v. | ) | 24JA42 |
| Mariah A., | ) | 24JA43 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Curtis S. Lane, |
| | ) | Judge Presiding |

JUSTICE LANNERD delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding the trial court's dispositional order was not against the manifest weight of the evidence.

¶ 2    Respondent, Mariah A., appeals from the trial court's dispositional order making her minor children, L.A. (born May 2022), Jax. A. (born November 2020), and Jay. A. (born December 2011), wards of the court. (The minors' fathers—Jeremiah W., the father of Jay. A., and Jon S., the father of Jax. A. and L.A.—are not parties to this appeal.) Respondent argues the court's order is against the manifest weight of the evidence. We affirm.

¶ 3                    I. BACKGROUND

¶ 4            A. Petition for Adjudication of Wardship

¶ 5    On July 2, 2024, the special prosecutor filed a juvenile petition for the adjudication

of wardship, alleging the minors were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)). The petition alleged the minors' environment was injurious to their welfare because respondent and Jeremiah, who had an ongoing relationship and coparented all the minors, had a history of domestic violence and frequently fought in front of the minors. Specifically, in October 2023, respondent drove to Jeremiah's home, left the minors in her vehicle, entered Jeremiah's house, and attacked him. Jeremiah filed a petition for an order of protection, which was granted. Respondent was arrested for violating the order of protection in December 2023. In March 2024, respondent called 911 after Jeremiah came to her home and battered her in front of Jay. A. and L.A. When the police responded, respondent and Jay. A. were in the front yard. Respondent was visibly distraught. Further, the petition alleged that although respondent agreed to complete intact services in October 2023 and was compliant with doing so, respondent continued to engage in acts of domestic violence in front of the minors.

¶ 6        On July 30, 2024, an amended juvenile petition for the adjudication of wardship was filed, adding two more volatile incidents between respondent and Jeremiah. Specifically, the petition alleged on July 25 and 26, 2024, respondent went to Jeremiah's house and refused to leave. On one of those dates, she yelled at Jeremiah and scratched his arm, leaving marks on his forearm. The minors were present during both incidents.

¶ 7        On the same day the amended petition was filed, Jeremiah filed a petition for an emergency order of protection. The petition alleged respondent committed four acts of violence or harassment against Jeremiah. First, on July 25, 2024, respondent arrived at Jeremiah's home while he was gone and banged on the door to be let in. When she could not get inside, she started yelling, cursing, and honking her car's horn. Neighbors called the police, who cited respondent for

trespassing and resisting arrest. Second, on July 26, 2024, Jeremiah heard a commotion coming from outside his home, went outside, and saw respondent yelling at and chasing Jay. A. Respondent eventually forced herself into Jeremiah's house, and she threw various things while Jeremiah kept Jax. A. and L.A. safe. After Jax. A. and L.A. were left safely on a couch in the living room, respondent attacked Jeremiah, scratching and hitting him several times before hitting herself on the head with a tool. The police were called, but respondent left before they arrived. Third, on July 28, 2024, respondent demanded Jeremiah retract his statements about the July 26, 2024, and October 2023 incidents, the latter of which resulted in criminal proceedings against respondent. Fourth, on July 29, 2024, respondent e-mailed Jeremiah, asking him why his attorney contacted the special prosecutor about the July 25 and 26, 2024, incidents. Attached to the e-mail was the attorney's letter. Soon thereafter, Jay. A. texted Jeremiah screenshots of the letter, and Jeremiah instructed Jay. A. to block respondent and not read the attorney's letter. The trial court granted Jeremiah's emergency order of protection.

¶ 8        Around this same time, the end of July 2024, the special prosecutor filed a shelter care petition to have the minors temporarily placed with the Illinois Department of Children and Family Services (DCFS). The trial court granted the motion.

¶ 9        In September 2024, respondent stipulated to the amended juvenile petition for the adjudication of wardship in its entirety. The trial court found the minors neglected because their environment was injurious to their welfare.

¶ 10       Thereafter, respondent and Jeremiah signed an agreed mutual restraining order, which the trial court approved on October 31, 2024.

¶ 11                          B. Dispositional Hearing

¶ 12       On that same date, the trial court conducted a dispositional hearing. The court

admitted into evidence documents showing respondent participated in various counseling and parenting classes. Further, the court also admitted reports prepared by the Court Appointed Special Advocates (CASA), the Center for Youth and Family Services (CYFS), and DCFS. The CASA report, which was prepared on October 15, 2024, provided, "[r]easonable efforts were made to keep the family intact, however despite services, the violence did not stop." Thus, the CASA recommended that guardianship remain with DCFS, with the right to place.

¶ 13 The CYFS report, which was prepared on October 23, 2024, revealed, on June 27, 2024, Jeremiah went to respondent's home for a custody exchange of Jay. A. Respondent attempted to climb through the window of Jeremiah's car and take his and his passenger's phones. Respondent scratched the passenger and yelled to Jay. A. that Jeremiah was recording the incident and causing a scene. Subsequently, the police attempted to arrest respondent for domestic violence, but she refused to exit her home. The police spoke to Jay. A., who told them "[respondent] gets unusually angry approximately every other week and he does not feel safe living with her during these occasions." The report from CYFS noted that this incident happened "[d]espite a prior history of past domestic violence issues and law enforcement/DCFS intervention with [respondent] and Jeremiah." Thus, although respondent was "relatively cooperative and compliant" with all her services, saying on several occasions she did not believe she needed to complete anything else, CYFS recommended that DCFS be granted guardianship of the minors, with a goal of them returning home within 12 months.

¶ 14 The DCFS family service plan, which was dated July 27, 2024, noted that respondent was involved with several domestic violence incidents since intact services began in October 2023. DCFS recommended that it retain guardianship of the minors, with the goal the minors return home in 12 months, as "[t]he parents need time to mitigate the issues that brought

the children into [its] care."

¶ 15                                    1. *Video Evidence*

¶ 16          In addition to the reports, the trial court considered two videos—one of the July 25, 2024, incident and the other of the July 26, 2024, incident—both of which the court viewed previously. The July 25, 2024, video showed respondent standing outside Jeremiah's house. A police officer was talking to respondent, who was telling the officer she needed to retrieve various items from inside the house. Respondent began arguing with the officer, who told respondent he was arresting her. Although respondent initially complied with the officer's orders to turn around so he could handcuff her, she soon resisted arrest, lying face down at one point while the officer attempted to handcuff her.

¶ 17          The July 26, 2024, video recorded the inside of Jeremiah's house. The video was taken a great distance from the area where several people were talking. Respondent and Jeremiah were two of the people in the home. A child was heard shrieking while respondent and Jeremiah were arguing. The child touched his grandmother, and respondent repeatedly yelled at the child not to do that. The child continued to scream and cry. At one point, Jeremiah, who sounded distraught, called the police, crying out in pain and asking the police to please hurry. The trial court found this video "extremely disturbing," noting it was "very, very disturbed by all of this." A photograph of Jeremiah's injuries admitted during the proceedings showed three red scratches, approximately six inches in length, running down the inside of Jeremiah's left forearm.

¶ 18                              2. *Testimony of Trinity Heddon*

¶ 19          After the trial court considered the documentary evidence, the State called Trinity Heddon as a witness. Heddon, a foster care caseworker for CYFS, became involved with the case the first week of August 2024. Since that time, there had been no incidents of domestic violence

between respondent and Jeremiah. Heddon believed this was attributable to (1) the agreed restraining order between respondent and Jeremiah and (2) the elimination of many of respondent's stressors, such as the minors being removed from her and Jeremiah's care.

¶ 20 According to Heddon, respondent, who lived in a nice home, (1) received food stamps, rental assistance, and child support; (2) was proactive with the minors' health care; (3) attended all supervised visits; (4) asked for additional visits; (5) watched the children during visits; (6) ensured they were safe; and (7) played with them in an age-appropriate way. She also provided clothes and school supplies for the minors while they were in the care of DCFS.

¶ 21 Respondent completed many services, including mental health treatment, and felt "that she's done enough to where she doesn't think she needs to do any more" to obtain custody of the minors. Heddon disagreed. Heddon, who thought respondent would complete additional services if they were recommended, believed respondent needed a parenting capacity evaluation to assess her understanding of the minors. She also believed respondent and Jay. A. needed family counseling, as respondent's interactions with Jay. A. were more limited than with the younger children and were sometimes inappropriate. For example, Heddon testified about a time Jay. A. asked to speak to the guardian *ad litem* (GAL), but when he did, he told the GAL he could not remember what he was supposed to say. Although Heddon could not determine that respondent instigated Jay. A.'s meeting with the GAL in any way, Heddon implied respondent may have talked to Jay. A. about what he needed to say to the GAL so she could obtain custody of the minors.

¶ 22 Heddon was troubled about the minors returning to respondent's care and being subjected to more acts of domestic violence. She believed three months was not long enough to eliminate whatever caused the acts of domestic violence between respondent and Jeremiah, noting that respondent, who had made positive progress in therapy, had not completed treatment for

domestic violence and anger management. Heddon recommended that guardianship of the minors remain with DCFS.

¶ 23                                    3. *Trial Court's Ruling*

¶ 24         The trial court entered a dispositional order finding respondent unfit and ordering the minors to be made wards of the court. The court determined guardianship would remain with DCFS, with the right to consent to treatment and placement and with the goal of the minors returning home in 12 months. The court found the best interests of the minors required the minors to live outside of respondent's house until she could correct the conditions that caused the minors to be removed from her home.

¶ 25         This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27         On appeal, respondent argues the trial court's dispositional order making the minors wards of the court was against the manifest weight of the evidence. The Juvenile Court Act provides a two-step process for the court to decide whether a minor should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing on the State's petition for adjudication of wardship. At this stage, the court must consider whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West Supp. 2023). If the trial court makes a finding that the minor is abused, neglected, or dependent, the court then determines at a dispositional hearing whether (1) the parents are "unfit or *** unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor or are unwilling to do so" and (2) "the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of the minors' parents." 705 ILCS 405/2-27(1)(d) (West Supp. 2023). When a minor is removed from his or her parents' custody and made a ward of the court, the court

determines the proper placement. *Id.* § 2-22(1).

¶ 28 At the outset, we note respondent stipulated to the amended juvenile petition for the adjudication of wardship, which alleged the minors were neglected. The trial court, pursuant to this stipulation, adjudicated the minors neglected. Respondent raises no issue on appeal concerning this stipulation. Accordingly, we do not consider whether the court erred in adjudicating the minors neglected.

¶ 29 Respondent does, however, take issue with the dispositional order. She argues the trial court's order making the minors wards of the court was against the manifest weight of the evidence. A trial court's dispositional order will be reversed only if the court's findings of fact are against the manifest weight of the evidence. *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008). A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 30 In this case, the proceedings were initiated because the minors were neglected. The allegation of neglect was based on respondent and Jeremiah engaging in acts of domestic violence in front of the minors. These acts of violence continued not only after October 2023—when respondent attacked Jeremiah, was ordered to complete intact services, and was later arrested for violating an order of protection Jeremiah obtained—but also after July 2, 2024—when the special prosecutor filed the initial juvenile petition for the adjudication of wardship. One of the incidents that occurred after July 2, 2024, resulted in Jay. A. telling the police respondent gets angry frequently and when she does, he does not feel safe living with her. The CASA, CYFS, and DCFS reports all concluded, because of the continued acts of domestic violence committed in front of the minors, the minors' best interests would be served by making them wards of the court, with the

goal of returning them home within 12 months. Heddon agreed with these recommendations, noting specifically that she was concerned with the minors returning to respondent's custody when, in the three months since the children were removed from her care, respondent had not completed treatment for domestic violence or anger management.

¶ 31 According to respondent, because she provided for her children in various ways and completed numerous services, her children should be returned to her care. We disagree. Although respondent had completed many services, provided for her children in numerous ways, and interacted with them in mostly appropriate ways, she had failed to rectify the problem that led to the minors being removed from her custody in the first place. While it is true that respondent did not engage in acts of domestic violence in front of the minors for three months before the dispositional hearing, the reasons for that appear to have little, if anything, to do with respondent successfully completing treatment for her domestic violence or anger management issues. Rather, it appears to be due to the fact neither respondent nor Jeremiah had custody of the minors—and, thus, as Heddon suggested, respondent's stressors had been minimized.

¶ 32 For those reasons, we conclude the trial court's dispositional order was not against the manifest weight of the evidence.

¶ 33 III. CONCLUSION

¶ 34 For the reasons stated, we affirm the trial court's judgment.

¶ 35 Affirmed.